*This opinion is subject to revision before final*
*publication in the Pacific Reporter*

**2017 UT 63**

IN THE

## SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH,
*Appellee,*

*v.*

JOSHUA MARTIN,
*Appellant.*

No. 20150860
Filed September 7, 2017

On Direct Appeal

Fourth District, Provo
The Honorable Fred D. Howard
No. 121403218

Attorneys:

Sean D. Reyes, Att'y Gen., Christopher D. Ballard,
Asst. Solic. Gen., Salt Lake City, for appellee

Margaret P. Lindsay, Dustin M. Parmley, Douglas J. Thompson,
Provo, for appellant

JUSTICE HIMONAS authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE,
JUSTICE DURHAM, and JUSTICE PEARCE joined.

JUSTICE HIMONAS, opinion of the Court:

### INTRODUCTION

¶ 1    After a jury trial, Joshua Martin was convicted of four counts of aggravated sexual abuse of a child and sentenced to a composite term of thirty years to life in prison (fifteen years to life on each count, with one count running consecutive to the other three).

¶ 2    On appeal, Mr. Martin argues that the district court committed three sets of errors. First, he argues that the district court made a variety of errors in admitting expert testimony by a forensic interviewer at the Children's Justice Center. To the extent these arguments are preserved, we conclude that they lack merit.

¶ 3    Second, Mr. Martin argues that the district court abused its discretion, and violated his constitutional right to present a complete defense, when it excluded evidence of a witness's supposed prior false accusations of sexual misconduct. Although the district court's order excluding this evidence recited a factor from *State v. Shickles*, 760 P.2d 291 (Utah 1988), which we have since repudiated, it is apparent from the record that the district court did not rely on this disapproved factor, and we otherwise find no abuse of discretion.

¶ 4    Third, Mr. Martin challenges his sentence, arguing that the district court failed to properly apply *LeBeau v. State*, 2014 UT 39, 337 P.3d 254, in its interests-of-justice analysis, and that it abused its discretion in weighing the aggravating and mitigating factors in his case. To the extent that Mr. Martin identifies a potential legal error in the court's interests-of-justice analysis, this issue is waived because Mr. Martin did not object before the district court, and he does not argue on appeal that the district court committed plain error. We otherwise find no abuse of discretion in the district court's sentencing decision.

¶ 5    We therefore affirm Mr. Martin's sentence and conviction.

## BACKGROUND

¶ 6    The State tried Mr. Martin on four counts of aggravated sexual abuse of a child, a first-degree felony, for sexually abusing his sisters-in-law A.L. and N.L. while occupying "a position of special trust in relation to" them. UTAH CODE § 76-5-404.1(4)(h).

¶ 7    At trial, A.L. testified that Mr. Martin had touched her vagina on four different occasions while he was supervising her; N.L. testified that he touched her vagina twice—once under her underwear and once over it—while she was driving with him during a family road trip to New Mexico. The State also elicited testimony from Mr. Martin's First Sergeant in the Air Force, who testified that, after learning of N.L.'s and A.L.'s allegations,

Mr. Martin approached him and stated that "he had been thinking about seeking mental health assistance for a while . . . because he had thoughts about" one of the victims.

¶ 8    Mr. Martin's defense strategy at trial was to undermine the credibility of A.L. and N.L. in two ways: (1) by highlighting inconsistencies in their disclosures and testimony about his sexual abuse and (2) by developing evidence that the children had been coached into falsely accusing him of sexual misconduct by their adoptive mother (Mr. Martin's mother-in-law), Stephanie.[1]

¶ 9    In connection with the first prong of his defense strategy, Mr. Martin highlighted several inconsistencies in the victims' disclosures and testimony. For example, Mr. Martin noted that A.L. gave inconsistent testimony about the order in which the incidents of sexual abuse occurred. He also noted that the victims gave inconsistent descriptions of the circumstances of their abuse. Among other things, he pointed out that A.L. testified that she remembered a detail of one incident of sexual abuse—that she and Mr. Martin were watching a Western movie when Mr. Martin touched her—when she previously stated that she did not know what movie they were watching. Similarly, he highlighted that N.L. had initially disclosed that Mr. Martin had inappropriately touched her only once when they were on a road trip to New Mexico, but that she later disclosed more than one inappropriate touching.

¶ 10  In order to explain the inconsistencies in the victims' disclosures, the prosecution designated as experts two forensic interviewers from the Children's Justice Center: Chelsea Smith and Tracy Seegmiller. Over defense counsel's objection, the district court ruled that Ms. Smith was qualified as an expert on why child victims of sexual abuse often make incomplete initial disclosures and disclose additional details and facts pertaining to their sexual abuse over time. The court also allowed Ms. Smith to "testify regarding common behaviors, in addition to the arena of

---

[1] Stephanie is the natural mother of Mr. Martin's wife, Anna. She is also the adoptive mother of the victims in this case, Anna's adopted sisters, A.L. and N.L. Throughout this opinion and in order to shield the identity of the victims, we refer to Stephanie only by her given name.

disclosures, of children who have been abused." The court ruled that Ms. Smith was qualified "by virtue of her experience of conducting more than 1,800 interviews, and also through her experience as a therapist, through her on-the-job training and continuing education, and through her education during her master's and bachelor's degrees." Because the court concluded that Ms. Seegmiller's testimony would be cumulative of Ms. Smith's, however, it excluded her.

¶ 11  In addition to identifying inconsistencies in A.L.'s and N.L.'s testimony, Mr. Martin sought to develop evidence that A.L. and N.L. had been manipulated into falsely accusing him of sexual misconduct by their mother, Stephanie. In particular, Mr. Martin introduced opinion and reputation testimony regarding Stephanie's character for truthfulness, and he sought to introduce evidence that Stephanie had induced some of her other children to make false accusations of sexual misconduct in the past and evidence that Stephanie had, herself, falsely accused others of sexual misconduct. The State, for its part, sought to exclude this evidence under rules 404(b) and 403 of the Utah Rules of Evidence.

¶ 12  In a written evidentiary ruling filed on February 13, 2015, the district court permitted testimony that Stephanie had previously manipulated other of her children into levying false accusations of sexual misconduct, but it excluded the evidence that Stephanie had falsely accused others of sexual misconduct. It ruled that these alleged false accusations—which included a false claim that she and an in-law had had an affair and that another family member had made an unwanted sexual advance on her—were offered only to attack Stephanie's character. It also ruled that they were "in no way connected to this case" and would "only serve to confuse the issues, mislead the jury, and waste time."

¶ 13  Early on in its ruling, the court recited the factors from *State v. Shickles* for deciding whether evidence should be excluded under rule 403 of the Utah Rules of Evidence, including "the degree to which the evidence probably will rouse the jury to overmastering hostility." 760 P.2d 291, 295–96 (Utah 1988). But it did not rely on this factor in excluding evidence of Stephanie's prior false accusations.

¶ 14 After hearing the evidence, the jury convicted Mr. Martin. At the sentencing hearing, the prosecutor asked the court to sentence Mr. Martin to fifteen years to life on each of the four counts of conviction, with one count to run consecutive to the others, for a composite sentence of thirty years to life. The prosecutor argued that this sentence was proportionate to the presumptive sentence for two similar offenses: sodomy of a child and rape of a child. The prosecutor also argued that Mr. Martin deserved this sentence because he had perpetrated multiple acts of abuse on more than one victim. The prosecutor emphasized that, instead of taking responsibility for his criminal conduct, Mr. Martin had used his sentencing hearing as an additional opportunity to attack the honesty of the victims' family. And the prosecutor pointed out that Mr. Martin had been able to maintain the confidence of many members of his community—some of whom stated, even after he was convicted, that they would trust him with their children—which underscored the risk he posed to community safety.

¶ 15 After the State rested, Mr. Martin was given the opportunity to respond. Mr. Martin asked for a sentence of six years to life. Because he had been convicted of aggravated sexual abuse of a child based on the position of special trust that he occupied, Mr. Martin urged the court not to "double count" that factor in settling on its sentence.

¶ 16 The sentencing court agreed not to put undue weight on Mr. Martin's having occupied a position of special trust, and it noted Mr. Martin's good work history and lack of a criminal record. It also acknowledged that Mr. Martin's conduct had not inflicted physical injury on his victims. But it ultimately concluded that the fact that Mr. Martin had perpetrated multiple acts on two different child victims, that he refused to take responsibility, and that he had continued to attack the credibility of his victims' family even after he was convicted warranted a more severe sentence. Stating that it largely embraced the prosecutor's reasoning, the court imposed the sentence that the prosecutor requested: fifteen years to life on all four counts, with one count running consecutive to the others.

¶ 17 Mr. Martin now appeals his conviction and sentence. We have jurisdiction under Utah Code section 78A-3-102(3)(i).

**STANDARDS OF REVIEW**

¶ 18   Generally, district courts are afforded "a great deal of discretion in determining whether to admit or exclude evidence." *State v. Cuttler*, 2015 UT 95, ¶ 12, 367 P.3d 981 (citation omitted). Thus, as long as the district court did not make an error of law, this court will reverse a district court's decision to admit or exclude evidence under rules 608, 404(b) and 403 of the Utah Rules of Evidence only if that decision "is beyond the limits of reasonability." *Id.* (citation omitted); *see also State v. Killpack*, 2008 UT 49, ¶ 18, 191 P.3d 17.

¶ 19   The same standard of review applies to district courts' decisions to admit or exclude expert testimony under rule 702. As long as the court has not applied the wrong rule or misinterpreted the law, "[t]he trial court has wide discretion in determining the admissibility of expert testimony, and such decisions are reviewed under an abuse of discretion standard." *State v. Hollen*, 2002 UT 35, ¶ 66, 44 P.3d 794 (citation omitted). We therefore "will not reverse [a decision to admit or exclude expert testimony] unless the decision exceeds the limits of reasonability." *Id.* (alteration in original) (citation omitted).

¶ 20   Finally, unless the court "fails to consider all legally relevant factors," imposes an illegal sentence, or bases its sentencing determination on an erroneous interpretation of law, *LeBeau v. State*, 2014 UT 39, ¶ 16, 337 P.3d 254, this court will overturn a sentencing decision only if it is "clear that the actions of the [sentencing] judge were so *inherently unfair* as to constitute an abuse of discretion," *Killpack*, 2008 UT 49, ¶ 18 (citation omitted).

**ANALYSIS**

¶ 21   We first address Mr. Martin's arguments that the district court erred in connection with the expert testimony of Chelsea Smith. We conclude that, to the extent Mr. Martin's arguments are preserved, they lack merit. We then consider Mr. Martin's argument that the district court abused its discretion—and violated his constitutional right to present a complete defense—in excluding purported evidence that the victims' mother had previously accused other people of sexual misconduct, and we conclude that the district court did not err. Finally, we explain why we uphold Mr. Martin's sentence.

## I. THE DISTRICT COURT DID NOT ERR IN CONNECTION WITH THE STATE'S EXPERT'S TESTIMONY

¶ 22 As we have explained, the district court allowed the State to call a forensic interviewer from the Children's Justice Center who was qualified as an expert in two areas: (1) the reasons children make multiple and incomplete disclosures about abuse and (2) the "common behaviors . . . of children who have been abused." At trial, the expert described child interview protocols, testified about the reasons children make incomplete or inconsistent disclosures about sexual abuse, and explained that children respond to sexual abuse by demonstrating a wide and largely unpredictable array of behaviors. While she did identify some common behavioral changes that occur in child victims of sexual abuse—such as depression, anxiety, changes in sleep, and changes in school performance—she stated that these changes are not to be expected in every case and ultimately are not reliable indicators of whether abuse has, or has not, occurred.

¶ 23 In the course of explaining why children do not always fully disclose sexual abuse, the expert made comments about children's memory. She testified that children sometimes have difficulty with memory retrieval. She also testified that "[t]he more that we talk about things . . . we will often remember more or additional details"—a process that the expert called "reminiscence."

¶ 24 On appeal, Mr. Martin argues that the district court committed three errors in connection with this testimony. First, keying into the expert's testimony about memory retrieval and "reminiscence," he argues that the district court erred in allowing the expert "to testify extensively about child memory and recall." Second, he argues that the district court should not have allowed the expert to testify "regarding reasons why children will give differing disclosures of alleged abuse"—or about the wide variety of behaviors that abused children exhibit—because this testimony was "unhelpful, misleading and unfairly prejudicial." Finally, he argues that the expert's testimony improperly bolstered the victims' testimony.

*A. Mr. Martin Did Not Preserve His Argument that
the Expert Exceeded the Scope of Her Expertise in
Testifying About Memory Formation and Recall*

¶ 25  Mr. Martin's first argument is unpreserved. "Generally speaking, a timely and specific objection must be made in order to preserve an issue for appeal." *State v. Pinder*, 2005 UT 15, ¶ 45, 114 P.3d 551. To be specific, the objection must present the issue to the court "in such a way that the trial court has an opportunity to rule on that issue." *In re Adoption of Baby E.Z.*, 2011 UT 38, ¶ 25, 266 P.3d 702 (citation omitted). This court will not consider an issue to which no timely and specific objection has been made "unless the trial court committed plain error or exceptional circumstances exist." *State v. Nelson-Waggoner*, 2004 UT 29, ¶ 16, 94 P.3d 186. And we will not find plain error or exceptional circumstances unless the appellant argues in his opening brief on appeal that one of those exceptions to the preservation requirement applies. *See Coleman ex rel. Schefski v. Stevens*, 2000 UT 98, ¶ 9, 17 P.3d 1122 ("[B]ecause Mr. Coleman did not properly raise these three issues in the trial court and thereby preserve them for appellate review, and because he argued plain error or manifest injustice for the first time in his reply brief, we decline to review them.").

¶ 26  Mr. Martin did not object to any of the testimony about which he complains on appeal. While Mr. Martin did move, prior to trial, to exclude the State's expert altogether, this motion was not sufficient to give the district court the opportunity to rule on whether the expert should have been permitted to testify about childhood memory and recall. *Cf. State v. Eldredge*, 773 P.2d 29, 34–35 (Utah 1989) (objection to witness's testimony based on competency insufficient to preserve appeal of witness's reliability). The district court did not authorize this expert to testify about childhood memory and recall. Instead, it authorized the expert to testify "regarding multiple disclosures and potential reasons for multiple disclosures" based on "her experience of conducting more than 1800 interviews . . . , her experience as a therapist . . . , her on-the-job training and continuing education, and . . . her education during her master's and bachelor's degrees." While this order arguably dispensed with the need for any future objection to the expert's qualifications to give testimony *based on her training and experience* as to why children

make multiple and incomplete disclosures of sexual abuse, it did not obviate the need for counsel to object to testimony that exceeded the scope of what the court determined to be the expert's expertise. *See State v. Shepherd*, 2015 UT App 208, ¶ 30 n.6, 357 P.3d 598 (distinguishing between objections that the expert exceeded the scope of his or her expertise, or offered an impermissible lay opinion, and challenges to the expert's qualifications). Accordingly, Mr. Martin needed to object to testimony about childhood memory and recall in order to preserve this issue for appeal. Because he did not, and because he failed to argue on appeal that plain error or exceptional circumstances justify our review, the issue is waived. *See Nelson-Waggoner*, 2004 UT 29, ¶ 16; *Coleman*, 2000 UT 98, ¶ 9.

¶ 27 In any event, we note that what Mr. Martin characterizes as the expert's "extensive[]" testimony about child "memory formation and recall" amounted to brief remarks that (1) children sometimes forget information and then remember it later, (2) the more children talk about events the more they remember about them, and (3) children's memories are malleable and suggestible. None of these statements called for expertise in the mechanisms of memory retrieval and recall. Instead, these statements simply described trends and tendencies that were readily observable by a forensic interviewer with the expert's level of training and experience. When her testimony is viewed in context, we do not believe that the expert sought to testify to psychological or neuroscientific matters beyond the scope of her expertise.

### B. The District Court Did Not Abuse Its Discretion in Permitting the Expert Testimony

¶ 28 Mr. Martin next argues that the district court should not have allowed the expert to testify "regarding reasons why children will give differing disclosures of alleged abuse" because this testimony was "unhelpful, misleading and unfairly prejudicial" and invaded the province of the jury. Mr. Martin argues that the jury should have been expected to know that "sometimes children are afraid to give all the details" of sexual abuse initially, and that they will sometimes "remember more details later." Likewise, he argues that the expert's testimony that not all child victims of sexual abuse exhibit behavioral changes was unhelpful. By Mr. Martin's lights, testimony that child victims of sexual abuse exhibit a wide and ultimately

unpredictable variety of behaviors is "indicative neither of truth nor falsity of [a child's] allegation" of sexual abuse.

¶ 29 We disagree. Rule 702(a) of the Utah Rules of Evidence provides that

> a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Under this rule, courts should generally exclude testimony if the testimony "is within the knowledge or experience of the average individual." *State v. Larsen*, 865 P.2d 1355, 1361 (Utah 1993). Courts must also, of course, always take care to ensure that the testimony does not "transgress[] into the area reserved for the jury"—including credibility assessments. *Id.*

¶ 30 Mr. Martin has not persuaded us that the expert testimony authorized in this case was unhelpful or unreliable, or that it improperly invaded the province of the jury. The district court was surely within its discretion to conclude that testimony about why child victims make inconsistent disclosures would be helpful to some—if not all—jurors who might otherwise think, for example, that sexual abuse so affects its victims that they will invariably make a complete disclosure to a therapist or a parent as soon as the issue is broached. It was similarly within the district court's discretion to conclude that expert testimony about the varied and unpredictable behaviors of children would inform the jury, or even counteract some of their preconceptions, about the effect of sexual abuse on child behavior. Notably, "[i]t is not necessary that the subject of the [expert] testimony be so erudite or arcane that the jurors could not possibly understand it without the aid of expert testimony, nor is it a requirement that the subject be beyond the comprehension of each and every juror." *Id.* We find no error in the court's permitting this testimony.

¶ 31 That said, we do not doubt that there are powerful arguments why the expert testimony that the district court allowed in this case—testimony about the typical behaviors of child sex abuse victims and the manner in which they make disclosures about their abuse—should be excluded in particular

cases. And we know from our own research that some other jurisdictions—though by no means all—have categorically excluded this testimony in the face of evidence showing that the testimony is unreliable, is essentially beyond the scope of any credible scientific or therapeutic method, or poses an undue risk of improperly influencing a jury's assessment of credibility. *Compare Sanderson v. Commonwealth*, 291 S.W.3d 610, 614 (Ky. 2009) (concluding that expert testimony about how child sex abuse victims typically behave, and the manner in which they disclose information about their abuse, is scientifically suspect and invades the province of the jury) *and Commonwealth v. Dunkle*, 602 A.2d 830, 832, 834 (Pa. 1992) (concluding that "[i]t is virtually impossible to clinically describe the elements of the 'child abuse syndrome' [i.e., a "diagnostic or behavioral profile about sexually abused children"] with any realistic degree of specificity"), *with State v. Favoccia*, 51 A.3d 1002, 1015 n.26 (Conn. 2012) (noting that "a majority of the jurisdictions to have considered this question . . . deem admissible expert testimony that a particular complainant has exhibited behavioral characteristics identified as those of sexual assault victims—so long as the expert does not offer an ultimate conclusion on the issue of sexual abuse or opine directly on the complainant's veracity"). *See also State v. Kallin*, 877 P.2d 138, 140–41 (Utah 1994) ("Expert testimony that [the victim's] symptoms are consistent with sexual abuse, subject to appropriate limitations and instructions to the jury, may enable the jury to assess the probative relevance of the evidence in light of all other evidence."). But Mr. Martin submitted no meaningful data or other evidence to show the district court that the testimony the district court allowed was prejudicial, unreliable, or unhelpful. Nor has he cited or sought to apply any of the myriad cases directly analyzing this nuanced and challenging problem before the district court or on appeal. Both at the district court level and before this court, therefore, Mr. Martin has failed to carry his burden of persuasion that admitting this testimony was an abuse of discretion.

¶ 32 That said, we urge our district courts to continue to carefully assess all scientific and technical evidence and argument put forth by the parties in deciding whether to admit this kind of evidence. Our only holding today is that, based on the arguments and evidence before the district court and before us, it was not an

abuse of discretion for the district court to permit the State to respond to Mr. Martin's attack on the victims' inconsistent statements by proffering an expert to "explain in general terms the behavioral characteristics of child abuse victims" and the reasons they might make multiple or differing disclosures about the abuse they suffered. *Favoccia*, 51 A.3d at 1013 (emphasis omitted) (citation omitted).

### C. *The District Court Did Not Commit Reversible Error in Connection with Any Improper Bolstering of the Child Victims' Credibility*

¶ 33   With one obvious exception, we likewise do not see any indication in the record—or the briefing—that the expert in this case improperly bolstered the victims' credibility. The expert did not seek to connect her testimony about the general behavioral characteristics of child victims of sexual abuse to A.L.'s and N.L.'s specific conduct. Indeed, the expert went out of her way on multiple occasions to explain that she was not offering an opinion on the credibility of the victims in this case. As with the many questions pertaining to the general admissibility of expert testimony in this arena, we do not decide today the circumstances under which the risk of prejudice attendant on "expert testimony that compares or links observations of the complainant to the behaviors of sexual assault victims generally" requires exclusion of that testimony. *Id.* at 1015. Our conclusion is only that, on the record before us, the district court did not abuse its discretion in permitting the testimony it allowed.

¶ 34   There is one obvious exception to our determination that the expert in this case did not improperly bolster the child victims' credibility—on cross-examination the expert testified that the children "seemed credible" to her. And even though Mr. Martin's counsel arguably elicited this testimony through cross-examination, we agree that it was plainly improper. *See State v. Ramsey*, 782 P.2d 480, 485 (Utah 1989) ("[A]n expert may not express an opinion as to a child's truthfulness with respect to statements of child sex abuse."). But, equally plainly, Mr. Martin has waived any claim for relief on appeal. This is because the district court struck the expert's answer and gave Mr. Martin all the relief he sought—a curative instruction stating that the expert was not qualified to speak to the credibility of the children and that her comments to that effect had been stricken from the

record. Mr. Martin accordingly waived a mistrial, and we will not now give him a greater remedy than he sought at trial. *See Patterson v. Patterson*, 2011 UT 68, ¶ 16, 266 P.3d 828 ("[R]equiring preservation of [a remedy] prevents a party from avoiding [seeking the remedy] at trial for strategic reasons only to raise the issue on appeal if the strategy fails." (citation omitted)).

¶ 35 We find no abuse of discretion in the district court's evidentiary rulings with respect to the State's expert witness in this case.

## II. THE DISTRICT COURT DID NOT ERR IN EXCLUDING EVIDENCE OF STEPHANIE'S FALSE ACCUSATIONS OF SEXUAL MISCONDUCT

¶ 36 A crucial component of Mr. Martin's defense at trial was that his accusers had been manipulated by their mother, Stephanie, into falsely accusing him of sexual misconduct. To support this theory, Mr. Martin sought to introduce evidence that Stephanie had previously manipulated other of her daughters into levying false accusations of sexual misconduct. He also sought to introduce evidence that Stephanie had a reputation for untruthfulness and that she, herself, had previously made false accusations of sexual misconduct against other people.

¶ 37 The district court allowed Mr. Martin to elicit testimony about Stephanie's reputation. After an extensive evidentiary hearing at which Mr. Martin proffered the testimony that he sought to admit at trial, the court also allowed Mr. Martin to introduce evidence that Stephanie had manipulated her daughters Anna Martin (Mr. Martin's wife) and Meagan Svedin into making allegedly false accusations of sexual misconduct against other people.

¶ 38 On the other hand, the court excluded multiple allegations that Stephanie had falsely accused others of sexual misconduct. In particular, the court forbade Mr. Martin from eliciting testimony (1) that Stephanie had falsely accused Anna Martin of abusing A.L. and N.L., (2) that she had falsely claimed to have had an affair, (3) that she had falsely accused her father-in-law of groping her, (4) that she had falsely accused her mother-in-law of having sexually abused her husband when he was a child, and (5) that she had falsely accused her brother-in-law of "making a sexual advance on her."

¶ 39 The court concluded that this evidence was impermissible propensity evidence, meant to show that because Stephanie had made false accusations of sexual misconduct in the past, she was more likely to have manipulated the victims into making false accusations against Mr. Martin. *See* UTAH R. EVID. 404(b)(1) ("Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character."). The court also ruled that the particular bad acts that Mr. Martin sought to introduce were "not needed as Defendant has proposed other, more directly related evidence that might show that . . . [Stephanie] improperly influenced the victims in this case"—i.e., the direct evidence, which the district court admitted, that Stephanie had sought to manipulate other of her daughters into making false accusations of sexual abuse. It therefore also excluded the evidence under rule 403 of the Utah Rules of Evidence, concluding that "the potential for confusion and waste of time is high." *See id.* 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). Finally, the court ruled that Mr. Martin could not inquire into these matters under rule 608(b) of the Utah Rules of Evidence—which provides that a district court "may, on cross-examination, allow [extrinsic evidence of specific instances of a witness's conduct] to be inquired into if they are probative of the character for truthfulness or untruthfulness of . . . the witness." *Id.* 608(b).

¶ 40 On appeal, Mr. Martin argues that the district court erred in excluding this evidence. He contends that the court committed an error of law in evaluating the admissibility of this evidence by applying the factors that we articulated in *State v. Shickles*, 760 P.2d 291 (Utah 1988). He also argues that, under the tests articulated in rules 403, 404(b), and 608, it was an abuse of discretion to exclude this evidence. And he claims that excluding the evidence violated his constitutional right to present a complete defense.

¶ 41 For the reasons we explain below, we uphold the district court's evidentiary ruling.

*A. The District Court Committed No Reversible Error
in Connection with Its Recitation of the
Shickles Factors*

¶ 42  Mr. Martin first argues that the district court committed an error of law in conducting its evidentiary analysis under rules 404(b) and 403 because it inappropriately applied the factors that we articulated in *State v. Shickles* for determining whether evidence should be excluded under rule 403. *See* 760 P.2d at 295-96 (urging courts to consider the following factors in analyzing the admissibility of evidence under rule 403: "the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility" (citation omitted)). We disagree.

¶ 43  It is true, as Mr. Martin points out, that the district court recited the *Shickles* factors at the beginning of its evidentiary order. It is also true that, shortly after this order was issued, we held that district courts should not consider one of the *Shickles* factors—whether evidence may rouse the jury to "overmastering hostility"—because the text of rule 403 requires judges to consider only whether the evidence poses a danger of "unfair prejudice," which is a lower burden. *State v. Cuttler*, 2015 UT 95, ¶ 20, 367 P.3d 981. Indeed, we have generally disapproved of courts' mechanically relying on the *Shickles* factors when they are not apposite to the particular evidentiary problem at hand. *See State v. Lucero*, 2014 UT 15, ¶ 32, 328 P.3d 841.

¶ 44  But we are convinced that, even though it recited the *Shickles* factors, the district court did not improperly rely on them in excluding evidence that Stephanie had falsely accused others of misconduct. The district court did not, for example, exclude this evidence on the basis that it would have roused the jury to "overmastering hostility." Instead, the court excluded this evidence because it was "not needed as Defendant has proposed other, more directly related evidence that might show that Stephanie improperly influenced the victims in this case" and because it was "only tenuously related to the case at hand." The court thus appropriately considered factors that were rooted in the text of rule 403, excluding the evidence because "the potential

for unfair prejudice, confusing the issues, misleading the jury, [and] waste of time are high." While it is, of course, error to consider whether admitting evidence will rouse the jury to "overmastering hostility," the district court did not make this mistake.

*B. The District Court Did Not Abuse Its Discretion in Excluding Evidence that Stephanie Had Falsely Accused Others of Sexual Misconduct*

¶ 45  Mr. Martin next argues that the district court abused its discretion in excluding this evidence because the sheer number of alleged false accusations by Stephanie powerfully supported an inference that accusations emanating from the victims themselves were likely to be false. He thus attempts to invoke a species of the "doctrine of chances" that we articulated in *State v. Verde*, according to which evidence of prior accusations may be admissible on the theory that "[a]s the number of improbable occurrences [such as accusations of sexual misconduct] increases, the probability of coincidence decreases, and the likelihood that the [witness]" has levied a false accusation increases. 2012 UT 60, ¶ 49, 296 P.3d 673.

¶ 46  We are not unmoved by Mr. Martin's evidentiary theory. It may well be permissible for a defendant to argue that because a mother—or other person in a demonstrated position of authority over a victim—has made repeated objectively improbable accusations of criminal conduct, it is therefore objectively improbable that the victim's accusations are true. *See id.* ¶¶ 49–50. Under the facts of this case, however, the district court did not abuse its discretion in excluding evidence that Stephanie had made repeated false accusations because, given the nature of the accusations and the nature of the evidence that the district court admitted, it was not error to conclude that the probative value of this evidence was substantially outweighed by its potential to waste time and confuse the jury. *See* UTAH R. EVID. 403.

¶ 47  As we have explained, Mr. Martin sought to introduce evidence of five different occasions on which Stephanie had allegedly falsely accused others of sexual misconduct. For each of these episodes—considered both singly and as part of a purported pattern of behavior—we conclude that the district court was well within its discretion in concluding that the minimal probative

value of this evidence was substantially outweighed by the risk it posed of wasting time and confusing the jury.

¶ 48  First, Mr. Martin argues that the district court abused its discretion in preventing his wife (Stephanie's daughter), Anna Martin, from testifying that Stephanie had "falsely accused Anna Martin of inappropriately touching A.L. . . . while Anna Martin was babysitting A.L. in 2004 or 2005." But there was no dispositive evidence that Stephanie had falsely accused Anna of inappropriate touching—just Anna's say-so. And had Mr. Martin been allowed to elicit this testimony, the district court would have been obliged to allow the State to put on rebuttal testimony from potentially multiple witnesses (Stephanie, Anna's twin sister, and Stephanie's husband) that Anna had in fact engaged in misconduct with both children, such as bathing with A.L. even after she was forbidden from doing so and breastfeeding N.L.

¶ 49  In any event, Anna was allowed to testify that Stephanie had manipulated her into falsely accusing two separate family members of sexual misconduct, and she was permitted to testify, without detail, that Stephanie had made other false allegations against family members. The jury thus had ample opportunity to credit Anna's testimony about Stephanie's purported penchant for manipulating children into making false accusations of sexual misconduct. Allowing an additional evidentiary inquiry into an accusation—maybe false, maybe not—levied by Stephanie against another witness in the proceeding, but utterly unrelated to the crimes of which Mr. Martin stood accused, would have been confusing, cumulative, and a waste of time.

¶ 50  The district court was equally within its discretion in excluding evidence that Stephanie had accused her father-in-law of groping her and that she had claimed to have had an affair. Again, had Mr. Martin been allowed to introduce this evidence, the State would have presented considerable rebuttal testimony. With respect to the affair, three of Stephanie's children would have testified that she had never claimed to have had an affair and one would have testified that the person with whom she allegedly claimed to have had an affair was always extremely well spoken of. And as for the alleged false accusation of groping, the record was simply unclear on whether Stephanie's father-in-law had ever inappropriately touched her breasts. Again, therefore, the jury would have been faced with a trial within a trial,

predicated on largely inconclusive evidence, and pertaining to comparatively minor episodes that were unrelated to the crimes at hand, and that were, at best, weakly probative of whether Stephanie would manipulate the victims into falsely accusing Mr. Martin of committing a serious crime. The district court did not err in concluding that the potential for confusion and waste of time substantially outweighed the probative value of these episodes.

¶ 51 The other two accusations that Mr. Martin sought to introduce—that Stephanie had falsely accused her mother-in-law of sexually abusing Stephanie's husband when he was a child and that her brother-in-law had made a sexual advance on her—likewise would have involved substantial trial-within-a-trial problems. The witnesses who would have testified to these incidents were obviously biased: one was Anna (Mr. Martin's wife), and the other two were parents who believed that Stephanie had persuaded Anna to falsely accuse their child of rape—an episode that the court allowed to be placed before the jury as evidence of Stephanie's tendency to induce her children to falsely accuse others of sexual misconduct. Moreover, none of the witnesses had personal knowledge of whether any of the accusations were in fact false. And, to suitably explore these issues, the court would have had to allow hazy and inconclusive testimony about long-past extramarital affairs between people who otherwise had no connection to the case, as well as intricate and confusing testimony about family history, inside jokes, and long-simmering, deep-seated feuds.

¶ 52 Considering these episodes holistically, as a tapestry of evidence from which a jury might have been invited to infer a pattern of baseless accusatory behavior by Stephanie, does not affect our conclusion that the district court's decision to exclude the evidence was proper. To admit evidence of all five episodes would have required the district court to subject the jury to time-consuming trials within a trial on weak and fundamentally unpersuasive evidence that was highly "attenuated from the facts of the case before us today." *State v. Tarrats*, 2005 UT 50, ¶ 42, 122 P.3d 581. These "mini-trials," moreover, would have ramified in multiple directions. To adequately ventilate the issues they would have presented, the court would have had to allow the jury to hear both the contradictory and often inconclusive evidence

offered about the episodes themselves, as well as baroque and sordid testimony about otherwise irrelevant familial dysfunction. The district court was well within its discretion to conclude that this digression would have served only to confuse the jury and invite them to draw improper inferences based on nothing more than a selective tour of some skeletons in the family closet.

¶ 53   For substantially the same reasons that we uphold the district court's decision to exclude evidence of Stephanie's alleged false accusations under rules 404(b) and 403, we also conclude that the district court did not abuse its discretion in prohibiting Mr. Martin from asking Stephanie about these accusations on cross-examination. Rule 608(b) provides that courts may allow a witness to be cross-examined about prior bad acts if such cross-examination would be "probative of the character for . . . untruthfulness of . . . the witness." UTAH R. EVID. 608(b). As the district court recognized, courts deciding whether to allow cross-examination under rule 608(b) must balance the extent to which the proposed testimony is probative of truthfulness or untruthfulness against the degree to which the testimony would result in "unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." UTAH R. EVID. 403; *see State v. Gomez*, 2002 UT 120, ¶ 34, 63 P.3d 72.

¶ 54   Here, the court did not abuse its discretion in concluding that the probative value of cross-examining Stephanie about the five alleged false accusations was substantially outweighed by the dangers of confusing the issues, misleading the jury, and wasting time. As we have explained, the probative value of this line of questioning was low—especially given that the jury had before it ample evidence of Stephanie's poor reputation for truthfulness. And the risk of confusion and waste of time inherent in cross-examination into matters otherwise wholly unrelated to the case against Mr. Martin was high. The district court therefore did not abuse its discretion in its rule 608 analysis.

¶ 55   Finally, we conclude that Mr. Martin's right to present a complete defense was not infringed. "[E]videntiary 'rules do not abridge an accused's right to present a defense as long as they are not arbitrary or disproportionate to the purposes they are designed to serve.'" *State v. Thornton*, 2017 UT 9, ¶ 76, 391 P.3d 1016 (quoting *United States v. Scheffer*, 523 U.S. 303, 308 (1998))

(other internal quotation marks omitted)). We have upheld the district court's decision to exclude evidence of Stephanie's alleged prior false accusations under rule 403 of the Utah Rules of Evidence. Unlike other rules whose categorical exclusion of classes of evidence may, in individual cases, work an arbitrary or disproportionate result, rule 403 has a proportionality analysis baked into it. Thus, as long as a district court does not abuse its discretion under rule 403, excluding evidence under that rule does not infringe a defendant's constitutional right to present a complete defense.

¶ 56 We uphold the district court's decision to exclude evidence of Stephanie's alleged prior false accusations.

### III. SENTENCING

¶ 57 Finally, Mr. Martin appeals his sentence. Relying on *LeBeau v. State*, 2014 UT 39, 337 P.3d 254, he argues that the sentencing court failed to properly consider whether the interests of justice warranted deviating from the fifteen-year-to-life presumptive term of imprisonment for aggravated sexual abuse of a child.[2] Specifically, he argues that the court failed to properly analyze whether the sentence it imposed was proportionate either to Mr. Martin's conduct or to sentences for similar offenses. As part of his challenge to the proportionality of his sentence to his conduct, Mr. Martin also argues that the court abused its discretion in weighing the aggravating and mitigating factors applicable to his case.

¶ 58 For the reasons we explain, we conclude that, to the extent they are not waived, Mr. Martin's challenges to his sentence fail.

### A. An Overview of the Pertinent Sentencing Framework

¶ 59 In *LeBeau*, we explained that, within the context of our aggravated kidnapping statute, Utah Code section 76-5-302, sentencing courts are required to perform an interests-of-justice analysis before imposing a sentence of life without the possibility of parole. 2014 UT 39, ¶ 24. Specifically, we explained that this

---

[2] Mr. Martin does not challenge the district court's decision to run one of these counts consecutive to the others.

interests-of-justice analysis requires the sentencing court to consider (1) "[t]he seriousness of the defendant's conduct in relation to the severity of his sentence" and (2) the severity of the defendant's sentence relative to "the sentences imposed for more and less serious crimes" in Utah. *Id.* ¶¶ 42, 47.[3]

¶ 60 In considering whether the seriousness of the defendant's conduct warrants deviating from—or, instead, adhering to—the presumptive sentence, sentencing courts must "consider all relevant facts raised by the parties about the defendant's crime in relation to the harshness of the penalty." *Id.* ¶ 42. As *LeBeau* explained, "the list of aggravating and mitigating circumstances created by the Utah Sentencing Commission"— which highlight many of the considerations that bear on the seriousness of criminal conduct and the culpability of a criminal offender—"provides a good starting point" for this assessment. *Id.* But other considerations must also inform the sentencing court's analysis of whether the criminal conduct warrants a harsher or more lenient penalty. We have highlighted a few of these factors, which include whether the offense was violent or nonviolent, *id.* ¶ 43, the "absolute magnitude of the crime," *id.* ¶ 44 (citation omitted), and the culpability of the offender—his or her mens rea and motivation, *id.* ¶ 45. We have also emphasized the importance of considering the offender's rehabilitative potential—including (among any other relevant factors) age, the extent to which the offender's conduct was tied to substance abuse, the offender's receptiveness to treatment, and the offender's criminal history. *Id.* ¶ 54. And we have urged courts to bear in mind that these factors

---

[3] In considering these two factors, the court must also bear in mind the role played by the Board of Pardons and Parole in our indeterminate sentencing scheme, and it must strive not to structure its sentences in such a way that the Board is hamstrung in its ability to make fine-grained assessments of an offender's rehabilitative progress. *See LeBeau v. State*, 2014 UT 39, ¶¶ 52–53, 337 P.3d 254. As a practical matter, this means that running too many sentences consecutively to each other, or otherwise acting to thwart the Board in its ability to monitor inmates' rehabilitation, is disfavored. *Id.* ¶ 52.

are "not intended to provide an exhaustive list . . . because sentencing remains a highly fact-dependent endeavor." *Id.* ¶ 46.

¶ 61   In addition to considering the individual characteristics of the offender and the circumstances of the offense, the court must also "compare the sentence being imposed to the sentences imposed for other crimes in Utah" with an eye toward avoiding arbitrary sentencing disparities. *Id.* ¶ 47. To ensure that this comparison fairly and accurately reflects the range of sentences to which like offenders are exposed, we require our courts to consider "the sentences imposed for more *and less* serious crimes." *Id.* (emphasis added). The ultimate question at this stage of the inquiry should be whether the overall sentence that the court plans to impose will be unusually high or low compared with the typical sentences for approximately similar offenses.

¶ 62   With this framework in mind, we turn to Mr. Martin's specific challenges to his sentence.[4] This court "traditionally afford[s] the trial court wide latitude and discretion in sentencing." *State v. Woodland*, 945 P.2d 665, 671 (Utah 1997). For this reason, as we explained above, we review sentencing decisions for an abuse of discretion. *State v. Helms,* 2002 UT 12, ¶ 8, 40 P.3d 626. Of course, our usual preservation requirements also apply—when a sentencing court commits an error that was not objected to below, an appellant must therefore show the existence of plain error or exceptional circumstances that would justify the exercise of our review. *See State v. Munguia*, 2011 UT 5, ¶ 36, 253 P.3d 1082.

*B. Mr. Martin Has Not Preserved His Challenge to the*
*Sentencing Court's Comparison of His Sentence*
*to Sentences for Similar Offenses*

¶ 63   Mr. Martin alleges failures in both the first and second steps of the *LeBeau* framework. Mr. Martin first argues that the sentencing court failed to properly compare his sentence to the

---

[4] As the State explained, "[f]or the purposes of this appeal, the State" did not contest the application of the interests-of-justice analysis set forth in *LeBeau* to this context (i.e., aggravated sexual abuse of a child). In light of this concession, we assume, but do not decide, that *LeBeau* applies to the case before us.

sentences imposed for "more *and less* serious crimes." *LeBeau*, 2014 UT 39, ¶ 47 (emphasis added). And it is true, as Mr. Martin points out, that the extent of the district court's comparison was to compare the sentence it imposed on Mr. Martin to the presumptive sentences for sodomy of a child and rape of a child. Generally, these offenses are more serious than the crimes of which Mr. Martin was convicted. *See* UTAH CODE § 76-5-403.1 (sodomy of a child involves oral or anal contact between adult and child); *id.* § 76-5-402.1 ("A person commits rape of a child when the person has sexual intercourse with a child who is under the age of 14."). And the sentencing court did not consider whether there were less serious similar offenses that carried with them other presumptive terms. It is therefore possible that the sentencing court was not able to fully assess whether Mr. Martin's sentence was proportionate to other sentences for comparable offenses.

¶ 64 While there may be issues with the way this portion of Mr. Martin's sentencing proceeded, what fault there is, if any, lies with Mr. Martin's trial counsel, who did not object to this analysis or otherwise ask the district court to compare the sentence it imposed to the presumptive sentences for other, less serious offenses. Because no objection was made, we may therefore reverse Mr. Martin's sentence only if the sentencing court committed plain error or if exceptional circumstances otherwise call for the exercise of our review. *See Munguia*, 2011 UT 5, ¶ 36; *see also Helms*, 2002 UT 12, ¶ 17.

¶ 65 But Mr. Martin does not argue plain error or the existence of exceptional circumstances on appeal. Indeed, Mr. Martin's appellate counsel does not even tell us what similar but less serious offenses the court should have considered to ensure that it was not imposing an arbitrarily severe term of imprisonment. Counsel has thus sought to dump onto this court the burden of scouring the criminal code for the less serious offenses that, in our own self-guided view, the sentencing court ought to have considered in assessing the propriety of the sentence it imposed.

¶ 66 We will not do this. "[A] reviewing court is not simply a depository into which the appealing party may dump the burden of argument and research." *State v. Honie*, 2002 UT 4, ¶ 67, 57 P.3d 977. Ranging across the criminal code in an effort to (1) identify

similar offenses and (2) compare their sentencing schemes to the sentence Mr. Martin received is a daunting task. It is also a task that we could not fairly undertake without affording the State the opportunity to respond to our analysis. And it is certainly not a task that we can require our district courts to perform without prompting or guidance from counsel. We therefore decline to reach this challenge to Mr. Martin's sentence.

### C. The Sentencing Court Did Not Abuse Its Discretion in Evaluating the Seriousness of Mr. Martin's Conduct

¶ 67   Mr. Martin next argues that the sentencing court abused its broad discretion in evaluating the seriousness of his conduct, including in weighing the aggravating and mitigating factors in his case. First, Mr. Martin argues that the sentencing court failed to consider the fact that his offenses were nonviolent and that his intent in committing them "was sexual arousal, not causing substantial emotional or bodily pain." But the sentencing court recognized that Mr. Martin's offenses were nonviolent, stating that "the assault is disturbing and serious, but . . . the victims did not suffer serious bodily injury." There is thus no indication in the record that the sentencing court failed to consider the nonviolent nature of Mr. Martin's offenses or that it attributed to Mr. Martin the intent to inflict substantial emotional or bodily pain on his victims.

¶ 68 Mr. Martin next argues that the sentencing court inappropriately assigned weight to the fact that his victims were children in enhancing Mr. Martin's sentence—when the legislature had already taken this fact into account in defining Mr. Martin's offense of conviction in such a way that one of its essential elements is that the misconduct involved a child. As Mr. Martin puts it, "the fact that Martin was convicted of harming children is why this was charged as aggravated sexual abuse of a child, and not some lesser sex offense like forcible sexual abuse, sexual abuse of a minor over 14, unlawful sexual conduct with a 16 or 17 year-old, or sexual battery."

¶ 69 To support his contention that the sentencing court inappropriately "double-counted" the fact that Mr. Martin's offense involved a child, Mr. Martin points to a portion of the record in which the prosecutor—whose analysis the sentencing court largely embraced—stated that the offense was particularly

grave because "you have here two innocent children irreparably harmed." But we do not read this portion of the record in the same way Mr. Martin does. The sentencing court did not think that Mr. Martin's sentence for aggravated sexual abuse of a child should be further enhanced simply because the offense involved (as it invariably will) a child. Rather, as we read this portion of the record, the court—quite properly—found Mr. Martin's conduct aggravated because it involved *two* children. It was entirely appropriate for the sentencing court to consider the fact that Mr. Martin abused two children in concluding that his conduct was especially grave. *Cf.* UTAH CODE § 76-5-404.1(4)(f) (aggravated sexual abuse of a child if "the accused committed the same or similar sexual act upon two or more victims at the same time or during the same course of conduct").

¶ 70 Third, Mr. Martin argues that the sentencing court improperly punished him for exercising his right to trial. But the sentencing court did not consider Mr. Martin's decision to go to trial as an aggravating factor. Instead, it punished him for his *post-conviction* failure to take responsibility for his conduct, and for his decision at the sentencing hearing to submit letters and elicit statements continuing to attack the credibility of his victims' family. These decisions, the court concluded, cast serious doubt on Mr. Martin's rehabilitative potential.

¶ 71 In his brief, Mr. Martin quotes a portion of the prosecutor's remarks to show that the court was asked to punish him for exercising his right to trial.

> *The Prosecutor:* [Mr. Martin's] failure to get up here and say, "I did it," and disabuse all of those people [i.e., the victims and their family] that they're at fault [for accusing Mr. Martin] is—is unthinkable, . . . and it's tragic that they have to get up here and defend their character again and again because *he won't take responsibility after a jury finds him guilty beyond a reasonable doubt.*

(Emphasis added.) But this excerpt reflects only that the prosecutor faulted Mr. Martin for impugning the character of his

victims' family and failing to take responsibility after the jury's verdict. It thus provides further support for the conclusion that the sentencing court only punished Mr. Martin for his post-conviction failure to take responsibility and express remorse. Thus, it was not Mr. Martin's decision to assert his innocence or insist on a trial that the court treated as an aggravating factor. Instead, it was the lack of any indication that he would accept responsibility and be successfully rehabilitated after being found guilty that drove the court's analysis. This was not an abuse of discretion.

¶ 72 Mr. Martin also contends that the prosecutor inappropriately asked the court to impose a more severe sentence because he did not take a plea offer. To support this contention, he points to a portion of the record where, in response to defense counsel's personal representation that "she had seen many more serious cases end up with lesser sentences than the mandatory minimum here of 15 to life," the prosecutor "suggest[ed] that a key difference between perhaps more serious cases [and Mr. Martin's] is a willingness to take responsibility, to accept a plea offer." As we read this portion of the record, however, the prosecutor was merely responding to defense counsel's remark by noting the reality that the State will often agree to a lower sentence when a defendant accepts responsibility and pleads guilty. Given defense counsel's comment, it was permissible for the prosecutor to point out that, as a result of the realities of plea bargaining, defendants who take their cases to trial often risk more severe punishment than defendants who accept plea offers.

¶ 73 Mr. Martin next argues that the sentencing court "inappropriately used the statutory element aggravator, position of special trust, as an aggravating factor in its interests-of-justice analysis." Again, we disagree with this interpretation of the record. It is true that Mr. Martin was charged with aggravated sexual abuse of a child—as opposed to second-degree sexual abuse of a child—because he sexually abused children while occupying "a position of special trust in relation to the victim." UTAH CODE § 76-5-404.1(4)(h). But the district court did not find the fact that Mr. Martin occupied a position of special trust to be

an aggravating factor at sentencing.[5] To the contrary, the court agreed with defense counsel that it should not enhance Mr. Martin's sentence based on his occupying a position of special trust because his "position of special trust . . . [is] already considered as an element of the offense":

| | |
|---|---|
| *Defense Counsel:* | [F]inally, in terms of the vulnerability of the children in this case, [the prosecutor] did bring up the aggravating factor. The aggravating factor is already an element that's part of the charge itself. |
| *The Court:* | That's true. |

---

[5] Mr. Martin separately argues that the district court failed to appreciate that the "position of special trust" aggravating factor is "relatively minor" when compared with many of the other aggravating factors that operate to convert sexual abuse of a child from a second-degree to a first-degree felony. Mr. Martin points out that other statutory aggravators—such as the use of a dangerous weapon, causing bodily injury or severe psychological injury, having been convicted previously of any sex offense, and benefitting from the prostitution or sex slavery of the child— encompass more egregious or damaging conduct.

Irrespective of the merits of Mr. Martin's legal analysis, we see no indication in the record that the district court put undue weight on Mr. Martin's occupying a position of special trust. Nor do we see any indication that the district court failed to appreciate that the "position of special trust" aggravator can encompass less serious conduct than some of the other statutory aggravators. Instead, the district court rooted its sentencing decision in its assessment of the effect of Mr. Martin's conduct on the victims and their family, Mr. Martin's failure to take responsibility for his conduct, and the fact that Mr. Martin committed multiple offenses against two different child victims. We do not see in this record a myopic or otherwise inappropriate focus on the "position of special trust" statutory aggravator.

| | |
|---|---|
| *Defense Counsel:* | It actually increases this from the second-degree felony sexual abuse of a child to aggravated sexual abuse of a child. So we're already—that's already taken into account. That should not be an additional aggravating factor in terms of sentencing. It's already taken into account on the elements of the offense. . . . |
| *The Court:* | The multiple victims? |
| *Defense Counsel:* | That, but also his position in terms of position of special trust. |
| *The Court:* | Of special trust. |
| *Defense Counsel:* | It's an element of the offense and it's what— |
| *The Court:* | That's the aggravation. |
| *Defense Counsel:* | —exactly. It already is considered as an element of the offense. |
| *The Court:* | Right. |

The court thus appeared to agree with Mr. Martin that it would have been improper to rely on the "position of special trust" aggravator in further enhancing Mr. Martin's sentence. While the court later "note[d] the position of trust" in delivering its sentence, it noted this aggravator alongside the facts that "the children were vulnerable, and there are multiple victims, multiple occurrences." Listing a statutory aggravator in the course of summarizing the totality of circumstances that support a particular sentence is a far cry from double-counting that aggravator.

¶ 74 Finally, Mr. Martin argues that the sentencing court improperly discounted his lack of criminal history, his "good employment history" and his family and community support. This, too, is not supported by the record. Instead, the court "note[d] that the defendant has no prior criminal record" and that "[h]e otherwise has good character and good employment."

¶ 75 Mr. Martin argues that the prosecutor improperly sought to convert Mr. Martin's community support into an aggravating factor by pointing out that Mr. Martin had been able to maintain community support and trust in his innocence even after he was convicted of sexual abuse of children. And it is true that the prosecutor argued that Mr. Martin's ability to maintain trust argued in favor of a more severe sentence: "The fact that so many people write these . . . character references stating they would trust [Mr. Martin] with . . . their children . . . shows me that he will have access to children again; and he can use that position of trust just as he did here with their children . . . ." But this was a permissible argument about community safety. On the facts of this case, it was not improper for the prosecutor to emphasize Mr. Martin's ability to maintain the trust of his community, and, indeed, to turn that community against his victims, in arguing that Mr. Martin posed a threat to public safety. To the extent that the court embraced the prosecutor's argument, it did not err.

¶ 76 On appellate review, it is not our task to reweigh aggravating and mitigating factors or to second-guess a district court's sentencing determination. *See State v. Killpack*, 2008 UT 49, ¶ 58, 191 P.3d 17 (recognizing that district courts "are best situated to weigh the many intangibles of character, personality and attitude, of which the cold record gives little inkling" (internal quotation marks omitted)). Instead, we will intercede only when the record reveals a clear abuse of discretion. While we recognize that, on the cold record, the sentence in this case may appear unusually harsh, the record does not reveal an abuse of sentencing discretion. Mr. Martin's was not the least serious conduct encompassed by the offense of aggravated sexual abuse of a child. Mr. Martin victimized two children with whom he had been entrusted, and he did so on multiple occasions. Then, even after he was convicted, he accused his victims and their family of lying and duplicity, enlisted his community of support in acts of character assassination, and failed to take responsibility for his crimes.

¶ 77 The sentencing court recognized that Mr. Martin did not entirely lack good character, that he was hardworking, and that he had no criminal history. But it ultimately concluded that a lengthy sentence was required in light of the nature of Mr. Martin's crime, the multiple victims, Mr. Martin's ability to

maintain positions of community trust—including with children—even after his conviction, and his decision not to take post-conviction responsibility, but instead to launch an egregious attack on the victims' family.

¶ 78 Only where a court has failed to examine all the relevant factors will we overturn a sentencing decision. *Helms*, 2002 UT 12, ¶ 8. That is not the case here. Here, the sentencing court examined the nature and circumstances of Mr. Martin's conduct, ultimately concluding that the gravity of the crime as well as his apparent lack of rehabilitative potential warranted a more severe sentence. We will not second-guess that decision absent some greater showing of deficiency.

## CONCLUSION

¶ 79 Mr. Martin has not persuaded us to overturn his conviction or his sentence. First, we find no error in connection with the State's expert's testimony in Mr. Martin's case. Mr. Martin failed to preserve his challenge to the expert's testimony on child "reminiscence" and "recall," and, in context, this testimony was within the scope of the expert's expertise. Additionally, based on the evidence and argument before it, the district court did not err in permitting general expert testimony about how children disclose sexual abuse and about the varied behaviors that child victims of sexual abuse exhibit—although we urge litigants in criminal cases and our district courts to be attuned to both the science in this complex and evolving field and the risks of bolstering and otherwise invading the province of the jury that such testimony poses.

¶ 80 Second, the district court did not err in its decision to exclude evidence of a witness's alleged prior false accusations of sexual misconduct. Although the court recited the *Shickles* factors, its analysis was firmly rooted in the text of rule 403 of the Utah Rules of Evidence. And its decision to exclude this evidence was well within its discretion. The court correctly admitted powerful evidence supporting Mr. Martin's theory that this witness lacked credibility, as well as his theory that the witness had manipulated the victims into falsely accusing him. Moreover, the evidence that the court excluded was extremely weak, inconclusive, confusing, and would have involved multiple, time-consuming trials within a trial. While it may not have been excludible under rule 404(b)

standing alone, it was no abuse of discretion for the district court to exclude it under the balancing tests of rules 608 and 403.

¶ 81 Finally, we affirm Mr. Martin's sentence. Had Mr. Martin asked the district court to consider the sentences for both more *and less* serious offenses in settling on the appropriate sentence in this case, the court would have been obliged by *LeBeau v. State* to undertake this analysis. But Mr. Martin did not make this request, and he therefore waived this issue on appeal. Otherwise, given the unique facts of this case, the district court did not abuse its discretion in concluding that Mr. Martin's criminal conduct, his apparent lack of rehabilitative potential, and his decision at sentencing to attack the victims' family instead of accepting responsibility for the crimes of which he had been convicted warranted the harsh sentence it imposed.

¶ 82  We affirm Mr. Martin's conviction and sentence.

———————————