2018 UT App 82

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
LONNIE NORTON,
Appellant.

Opinion
No. 20150302-CA
Filed May 3, 2018

Third District Court, West Jordan Department
The Honorable Bruce C. Lubeck
No. 131400015

Lori J. Seppi, Attorney for Appellant

Sean D. Reyes and Christopher D. Ballard, Attorneys
for Appellee

JUDGE JILL M. POHLMAN authored this Opinion, in which JUDGES
MICHELE M. CHRISTIANSEN and DIANA HAGEN concurred.

POHLMAN, Judge:

¶1     Lonnie Norton appeals his convictions arising from events that occurred over one night in November 2012 when he broke into his parents-in-law's house, kidnapped his estranged wife (Wife), and sexually assaulted her. Norton alleges several errors related to the jury instructions and sentencing. We affirm.

## BACKGROUND

¶2     In October 2012, Wife left Norton, her husband of over twenty years, taking their children with her. After staying in a women's shelter for several days and after a protective order against Norton went into effect, Wife and the children moved

into her parents' then-vacant house. The protective order permitted Norton to have supervised visits with the children and to communicate with Wife via email regarding "parent time, counseling, and school attendance."

¶3 On the date when the events leading to Norton's convictions occurred, Norton had overnight supervised parent time with the children in the marital home. Wife claimed that, on that night, Norton left the children and broke into her parents' house, after which he, among other things, kidnapped and raped her at gunpoint. The State charged Norton with aggravated kidnapping, a first degree felony; three counts of aggravated sexual assault, all first degree felonies; aggravated burglary, a first degree felony; aggravated assault, a third degree felony; violation of a protective order, a class A misdemeanor; and damage to or interruption of a communication device, a class B misdemeanor.

¶4 The case proceeded to a jury trial. Norton and Wife each testified about the events of that night and agreed on the following basic facts. It was snowing. After the children went to sleep, Norton retrieved Wife from her parents' house and drove the two to Fort Douglas on the University of Utah campus. Norton, who worked for the University, accessed a vacant office building with a key he had by virtue of his employment. Once inside the building, the parties had sexual intercourse in an office, after which Wife rinsed off in a bathroom across the hall. Norton then drove Wife first to the marital home to check on the children and then back to her parents' house. Aside from these facts, the parties' accounts differed significantly.

*Wife's Account*

¶5 Wife testified that, on the night in question, she awoke in the middle of the night to "a loud bang" downstairs in her parents' house, which she "figured . . . was [from] the dryer" that she had previously moved in front of a door to block entry from the basement's outside entrance. Wife grabbed her phone

and dialed 911 when Norton appeared "at the end of [her] bed." He punched her face with a closed fist, grabbed the phone, and duct-taped her head. She passed out, and when she regained consciousness, she was riding in Norton's car with him. She claimed that Norton "had a gun in his lap" and pointed it at her as she tried to open the car door. She realized that they were driving "up to the Fort Douglas area" near Norton's office at the University of Utah. After arriving at a building in the Fort Douglas area, Norton parked the car and told Wife that they were going to enter the building and that she "needed to be quiet or he would shoot [her]." Because she did not have any shoes on, Norton gave her a pair of his shoes and then led Wife toward the building and unlocked the entrance door.

¶6      Wife testified that Norton initially took her to a bathroom, where he "ripped the duct tape off [her] head" and began talking to her about their marriage, going to counseling, and getting back together. Wife rejected Norton's suggestions, and after talking for approximately twenty minutes, Norton told Wife "to take [her] shirt off." When she initially refused, he "pointed the gun at [her]" and again ordered her to take off her shirt. She complied. He then "squeezed [her] breasts" and led her to an office across the hall. Once there, he told her to "take off [her] pants." Again, she refused, and again he "pointed the gun at [her]," and she complied.

¶7      While Wife was undressing, Norton also undressed. Norton then "popped the magazine out of the gun" and put the gun pieces in a drawer. He "told [her] that [they] were going [to] have sex." She again told him, "no," which Norton dismissed, and Wife asked if he was "going to rape [her]." Norton replied, "You can't rape somebody that you're married to," and he laid down on the floor and pulled Wife on top of him. He then vaginally raped her. Wife testified that she made no effort to participate. She testified that at one point she grabbed his penis "really hard," but that because she has rheumatoid arthritis, she did not "know how hard" the squeeze was. Norton responded

by grabbing "both of [her] hands and . . . put[ting] them over [her] head in one of his hands."

¶8     Wife testified that afterward Norton took her back to the bathroom and ordered her "to get in the bathtub and rinse [herself] off." She stated that her "hands were shaking really bad" and that Norton told her that she was not "doing a good enough job," at which point he "shoved his fingers up in [her vagina] and tried to rinse himself out." Wife dried herself off with some paper towels, and they both got dressed.

¶9     Norton, having retrieved the gun, then told Wife to sit down on a chair. While he initially suggested the two reconcile, the conversation took a turn when he told her that "he was going [to] kill himself," and he put the gun to his head. He then pointed the gun at Wife and said, "[M]aybe I'll kill you and then I'll kill myself." Norton "went back and forth" about shooting himself and Wife for a few minutes, after which Wife "got really mad" and "[t]old him to go ahead and shoot himself." At that point, "it just ended," and Norton "took [Wife] back out into the car." Norton then drove them to their marital home and, after insisting that Wife "couldn't tell anybody" what had happened and that she needed to "make up some sort of story" to tell the children about how she hurt herself, he drove her back to her parents' house. Once there, Norton attempted to fix both a locked gate and the basement door through which he had entered earlier. He again told her not to tell anybody what had happened, and she told him she would not tell. After Norton left, Wife called the police, and an officer took her to the hospital.

*Norton's Account*

¶10     Norton testified at trial that Wife willingly accompanied him to the Fort Douglas office building and that she initiated the sexual conduct that occurred. He claimed that Wife had "told [him] to come over" to her parents' house after their children had gone to sleep and that, after missing her call at approximately two o'clock in the morning, he drove to the house

and parked in front. Though it was snowing, Norton testified that, "[a]fter a couple of minutes," Wife came outside "in stocking feet" and got into the car with him. He gave her some Reeboks to wear. He claimed that as they drove, Wife suggested going to his office to talk. Norton thought that rather than his office, "it might not be a bad idea to . . . go up to one of the buildings that's part of [his] college up in the Fort Douglas area." Accordingly, he parked behind a building there and unlocked the entrance to a unit that used to be an officer's quarters and was recently vacated by its tenant.

¶11 Norton testified that, once inside, the parties went into an office, sat down, and began talking about marriage counseling and possible reconciliation. Norton claimed that as they were reminiscing about when they first married, Wife went over "and sat on [his] lap and put her arms around [him]" and they began kissing. He testified that they eventually moved to the floor, undressed, and that Wife "climbed on top of [him]" and had sex with him.

¶12 Norton testified that afterward they went into the bathroom and that Wife got in the bathtub. Norton said that normally they would shower, but that because the water in the building was cold, he told Wife that he was not going to shower. Instead, he suggested to Wife that she "just rinse off," and he turned on the knob for her. He claimed that after Wife rinsed and dried herself off with paper towels he provided, they then went back into the office and dressed.

¶13 Norton testified that, at this point, the parties resumed their conversation about reconciliation. He stated that Wife indicated that she "didn't really want to reconcile," which prompted him to say that he thought it would be fair for him to have joint custody of their children. Wife responded that she did not want joint custody, and she became angry—calling him names—when he said his attorney told him that he would be able to get joint custody. At one point during the exchange, Wife

slapped Norton, and he claimed that he backhanded her "pretty hard" in response. He testified that Wife then tried to hit him again, and so he "grabbed her hands and [they] rastled for a minute," which caused Wife to start crying. Norton stated that Wife then went into the bathroom, shut the door, and refused to come out for about ten minutes.

¶14    When Wife came out, Norton and Wife left the building and got back into the car. Norton testified that Wife asked to check on their children at the marital home, which they did. Norton then drove Wife to her parents' house. When they arrived, they discovered the front door was locked. Norton testified that he then went around to the back door, and along the way opened a locked gate by pushing it "real hard." He then went and "pushed" the laundry room back door open and walked through the house to let Wife in around front.

¶15    Norton testified that, once inside, he again tried to talk to Wife about joint custody, which angered Wife. Wife then threatened to call the police and accuse him of breaking into the house and beating her up. Norton "got scared" and left.

*The Jury Instructions*

¶16    The State charged Norton with eight offenses of varying severity related to the events described above, specifically one count each of aggravated burglary, aggravated kidnapping, aggravated assault, violation of a protective order, and damage to or interruption of a communication device. The State also charged him with three counts of aggravated sexual assault, and the court specified which episode of abuse each count referred to in its instructions, referring to them as Count 2, Count 3, and Count 4. Count 2 concerned the "allegation of the touching of [Wife's] breast"; Count 3 concerned "the allegation of sexual intercourse"; and Count 4 concerned "the penetration of [Wife's] vagina by [Norton's] fingers."

¶17 Defense counsel requested lesser included offense instructions for the aggravated burglary charge, the aggravated kidnapping charge, and all counts of the aggravated sexual assault charges. The court permitted only one lesser included offense instruction for each count. For aggravated burglary, the court instructed on the lesser included offense of burglary, but it declined to instruct on both aggravated assault and assault. For the aggravated kidnapping charge, the court instructed on the lesser included offense of kidnapping, but it declined to instruct on unlawful detention. And for the aggravated sexual assault charges, the court permitted lesser included offense instructions related to each particular act. For Counts 2 and 4, it permitted the lesser included offense instruction of forcible sexual abuse. For Count 3, it instructed on rape. It declined counsel's request to instruct on sexual battery for those counts.

## The Verdict

¶18 The jury convicted Norton of two of the three charged counts of aggravated sexual assault—the counts pertaining to sexual intercourse and Norton inserting his fingers into Wife's vagina—and acquitted him of the aggravated sexual assault charge related to touching Wife's breasts. In addition, the jury convicted Norton of the lesser offense of kidnapping, the lesser offense of burglary, violation of a protective order, and a class B misdemeanor assault. The jury acquitted Norton of the damage to or interruption of a communication device count.

## Sentencing: The Three Tiers

¶19 The court instructed the jury that "[a] person commits aggravated sexual assault" if

> in the course of a rape or attempted rape or forcible sexual abuse, or attempted forcible sexual abuse, a person uses, or threatens the victim with the use of a dangerous weapon or compels, or attempts to compel, the victim to submit by threat of

kidnaping, death, or serious bodily injury to be inflicted imminently.

(Quotation simplified.) Thus, the jury was instructed that it could convict Norton of aggravated sexual assault based upon the underlying acts of a rape, an attempted rape, forcible sexual abuse, or an attempted forcible sexual abuse. However, at trial, no special verdict form was requested or given. As a result, although the jury convicted Norton of two aggravated sexual assault charges, it did not specify on which underlying offenses it relied to convict Norton of those charges.

¶20   During sentencing, defense counsel requested that the trial court sentence Norton under the lowest tier of the aggravated sexual assault sentencing scheme—the six-years-to-life tier.[1] Counsel explained to the court that because there was not a special verdict form, it was inappropriate to sentence Norton according to the highest tier—the fifteen-years-to-life tier. Counsel asserted that the jury instruction "allow[ed] for the jury to find the defendant guilty . . . for the offense based on an attempted forcible sexual abuse," and contended that "there's no indication or evidence that the jury made a finding other than that." He also contended that, because there was no special

---

1. Unless otherwise indicated, we cite the version of the relevant statutes in effect at the time of Norton's offenses. The aggravated sexual assault statute creates a three-tiered sentencing scheme, which is dependent upon the underlying offense for which conviction is entered. Utah Code Ann. § 76-5-405(2) (LexisNexis 2012). If the underlying sexual offense is rape or forcible sexual abuse (as pertinent here), the presumptive prison sentence is fifteen years to life. *Id.* § 76-5-405(2)(a)(i). If the underlying offense is attempted rape, the presumptive prison sentence is ten years to life. *Id.* § 76-5-405(2)(b)(i). And if the underlying offense is attempted forcible sexual abuse, the presumptive prison sentence is six years to life. *Id.* § 76-5-405(2)(c)(i).

verdict form, it would violate Norton's right to a jury trial to find at sentencing that he committed a completed act under the highest tier where the jury could find from the evidence that Norton committed attempted forcible sexual abuse. In response, the State argued that Norton should be sentenced under the highest tier because "there was never any evidence that this was an attempted forcible sex abuse or an attempted rape. It was all evidence that it was an actual rape and actual forcible sex abuse."

¶21 Although the court determined that defense counsel's argument had some merit, the court ultimately agreed with the State, taking a "common sense approach" and determining that although the instructions included the offenses of attempted rape and attempted forcible sexual abuse, "[t]he evidence presented is that there was an actual act of sexual intercourse" and "an actual . . . insertion [in her vagina] by his hand." Accordingly, the court ruled that it was proper to sentence him at the highest tier because the "evidence as presented" related to actual, not attempted, conduct and "there was never an argument made that this was an attempted rape or attempted forcible sexual abuse."

*Sentencing: The Interests of Justice Analysis*

¶22 Once the court determined that it was proper to sentence Norton at the highest tier for the aggravated sexual assault convictions, defense counsel then requested that the court impose terms of six-years-to-life on those counts and to run the sentences concurrently.[2] In requesting the lesser sentence,

---

2. In addition to providing three sentencing tiers, the aggravated sexual assault statute provides that a court may impose less than the presumptive sentence if the court "finds that a lesser term than the term described" as presumptive "is in the interests of justice and states the reasons for this finding on the record." *Id.*

(continued…)

defense counsel identified several facts which, in his opinion, merited a lesser sentence. Norton also made a statement, expressing his regret at having violated the protective order and for having hurt Wife and his family and stating a desire to move forward personally and professionally to "rebuild [his] life." In response, the State requested that the court impose the presumptive sentences of fifteen years to life on both of the aggravated sexual assault counts and that the sentences run consecutively. The State contended that a lesser sentence on those counts made "no sense," particularly where Norton had not accepted responsibility for what he had done and the crimes were "terrible." The court also had the benefit of the Presentence Investigation Report (the PSI) prepared by Adult Probation & Parole, which recommended imprisonment according to the statutory terms and indicated that "there are not enough mitigating circumstances to override the serious nature of the current offense."

¶23   The court sentenced Norton to the presumptive fifteen years to life on each of the aggravated sexual assault counts. It recognized that Norton had "a good past in many, many ways" but that "one of the real difficulties" in the case was Norton's "inability and unwillingness to follow the truth," stating that the court and the jury did not believe the events happened "at all the way [Norton said] they happened." The court also stated that Norton's conduct "went[] way, way, way over the line" and was of a kind "that simply cannot be accepted in our society," and that while it recognized a fifteen years to life sentence would be lengthy, especially given Norton's age, the extreme and harmful

---

(…continued)
§ 76-5-405(3)(a). For offenses falling under the highest tier of sentencing—fifteen years to life—the court may find it is in the interests of justice to impose a lesser prison sentence of either "10 years and which may be for life," or "six years and which may be for life." *Id.*

nature of Norton's conduct merited the presumptive sentence. Nonetheless, the court stated that Norton was "entitled to some mercy" in that it did not believe that the sentences ought to be consecutive. Accordingly, on the aggravated sexual assault counts, the court sentenced him to two terms of fifteen years to life, with the sentences to run concurrently.

¶24 Norton timely appealed from the court's judgment, sentence, and commitment.

## ISSUES AND STANDARDS OF REVIEW

¶25 Norton first argues that the court erred by giving instructions of aggravated sexual assault and its lesser included offenses that did not properly inform the jury of the mens rea that applies to the nonconsent element. "Generally, whether a jury instruction correctly states the law presents a question of law which we review for correctness," and we "will affirm when the instructions taken as a whole fairly instruct the jury on the law applicable to the case." *State v. Moore*, 2015 UT App 112, ¶ 4, 349 P.3d 797 (quotation simplified).

¶26 Norton next argues that the court erred by refusing to give requested lesser included offense instructions on the aggravated sexual assault, aggravated kidnapping, and aggravated burglary counts. "A trial court's refusal to grant a lesser included offense instruction is a question of law, which we review for correctness." *State v. Reece*, 2015 UT 45, ¶ 16, 349 P.3d 712 (quotation simplified).

¶27 Finally, Norton asserts two claims of error concerning his sentence. First, he argues that the court violated his right to due process and his right to trial by jury when it sentenced him under the highest sentencing tier on the aggravated sexual assault counts for which he was convicted. "[C]onstitutional questions present questions of law that we review for correctness without deference to the lower court's ruling." *State*

*v. Candedo*, 2010 UT 32, ¶ 7, 232 P.3d 1008. Second, Norton argues that the court abused its discretion when it imposed two terms of fifteen years to life on the two aggravated sexual assault convictions "without conducting the statutorily mandated interests-of-justice analysis." We review a trial court's sentencing decision for an abuse of discretion. *See LeBeau v. State*, 2014 UT 39, ¶ 16, 337 P.3d 254 ("An appellate court will . . . only set aside a sentence if the sentence represents an abuse of discretion, if the district court fails to consider all legally relevant factors, or if the sentence imposed is clearly excessive." (quotation simplified)).

ANALYSIS

I. Jury Instructions

¶28 Norton first argues that the instructions on the aggravated sexual assault charges and the associated lesser included offenses of rape and forcible sexual abuse misstated the law. Norton asserts that under *State v. Barela*, 2015 UT 22, 349 P.3d 676, the instructions "failed to instruct the jury that it could not convict unless it found that Norton acted with the requisite mens rea as to [Wife's] nonconsent" and that, had the jury been properly instructed, there is a reasonable probability that it would have acquitted him of those charges.

¶29 "A mens rea element is an essential element of an offense," and as a general rule, failure to accurately instruct on it is error. *See State v. Bird*, 2015 UT 7, ¶ 14, 345 P.3d 1141 (quotation simplified). The crime of rape requires that a defendant has the "requisite mens rea as to the victim's nonconsent."[3] *Barela*, 2015 UT 22, ¶ 26.

_____

3. The State does not contest that this principle also applies to other sexual offenses requiring proof of a victim's nonconsent. Given the State's position and our conclusion that Norton was

(continued…)

¶30 Norton concedes that this issue is unpreserved and requests that we review it under the doctrines of manifest injustice, plain error, or ineffective assistance of counsel. To establish ineffective assistance of counsel, Norton must show both that his trial counsel's performance was objectively deficient and that counsel's deficient performance prejudiced him. *See Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). To establish manifest injustice[4] and plain error, Norton must demonstrate the existence of an "obvious, prejudicial error." *State v. Bell*, 2016 UT App 157, ¶ 8, 380 P.3d 11. The prejudice standards for ineffective assistance and plain error are the same. *State v. McNeil*, 2016 UT 3, ¶ 29, 365 P.3d 699. Norton must demonstrate that, but for the errors, "there is a reasonable probability that . . . the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *See Strickland*, 466 U.S. at 694. And because Norton must meet all the elements of each test to prevail, we may dispose of both claims on prejudice alone without analyzing the other elements. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232.

¶31 The court instructed the jury that it could not find Norton guilty unless the State proved "a mental state as to each of the . . . counts charged." The court also instructed the jury as to

---

(…continued)

not prejudiced by the instructions, "we assume without deciding that the principle applies more broadly" to all of the sexual offenses at issue here. *See State v. Reigelsperger*, 2017 UT App 101, ¶ 73 n.8, 400 P.3d 1127.

4. Manifest injustice is generally synonymous with the plain error standard. *See State v. Pullman*, 2013 UT App 168, ¶ 5, 306 P.3d 827. Norton has not argued in this case that it is not. Therefore, we review his challenges under the same standard.

the meaning of applicable mental states.[5] As to the aggravated sexual assault charges, the court instructed that the jury could find Norton guilty of aggravated sexual assault if it found beyond a reasonable doubt that

> 1. On or about the date charged in the Information [Norton] raped or attempted to rape or committed forcible sexual abuse or attempted forcible sexual abuse against [Wife]; and
>
> 2. That in the course of that rape or attempted rape or forcible sexual abuse or attempted forcible sexual abuse [Norton]
>
>> (a) used or threatened [Wife] with the use of a dangerous weapon; or
>>
>> (b) compelled, or attempted to compel, [Wife] to submit to rape or forcible sexual abuse by threat of kidnaping, death, or serious bodily injury to be inflicted imminently; and
>
> 3. That [Norton] did such acts knowingly or intentionally.

¶32   The court then provided separate instructions for rape and forcible sexual abuse. As to rape, it instructed that the jury

---

5. The court instructed that "intentionally" meant "[a] person acts . . . [with a] conscious objective . . . to cause a certain result or to engage in certain conduct," and it instructed that a person acts "knowingly" when the person "is aware of the nature of his conduct," "is aware of the particular circumstances surrounding his conduct," or "is aware that his conduct is reasonably certain to cause the result." *See generally* Utah Code Ann. § 76-2-103 (LexisNexis 2012).

could convict Norton if it found beyond a reasonable doubt that, "[Norton] had sexual intercourse with [Wife]"; that "such conduct was without the consent of [Wife]"; and that "said conduct was done intentionally or knowingly." For forcible sexual abuse, it instructed that the jury could convict Norton if it found beyond a reasonable doubt that

> 1. On or about the date charged [Norton] touched the anus, buttocks, breasts, or any part of the genitals of [Wife]; and
>
> 2. That such conduct was done with the intent to either
>
>> (a) cause substantial emotional or bodily pain to [Wife], or
>>
>> (b) arouse or gratify the sexual desires of any person; and without the consent of [Wife]; and
>
> 3. That said conduct was done intentionally or knowingly.

¶33 Assuming, without deciding, that these instructions were erroneous under *Barela* and that counsel performed deficiently by not objecting to them, we conclude that Norton has not demonstrated that he suffered prejudice.

¶34 "A reviewing court attempting to determine whether the omission of an element from a jury instruction is harmless error 'asks whether the record contains evidence that could rationally lead to a contrary finding with respect to the omitted element.'" *State v. Ochoa*, 2014 UT App 296, ¶ 5, 341 P.3d 942 (quoting *Neder v. United States*, 527 U.S. 1, 19 (1999)). For example, in *State v. Barela*, the defendant, who was convicted of rape, argued that the jury instruction improperly omitted the mens rea as to the issue of nonconsent. 2015 UT 22, ¶¶ 20, 26, 349 P.3d 676. After agreeing with the defendant that the jury instruction was

incorrect, *id.* ¶ 26, our supreme court proceeded to determine whether the omission was harmful, *id.* ¶¶ 28–32. The supreme court analyzed the issue by reviewing the record evidence and asking whether a reasonable jury could have found, based on the "totality of the evidence in the record," that the defendant did not have the required mental state as to the victim's nonconsent. *See id.* The court determined that there was such a basis. The defendant had contended during trial that the sexual conduct had been consensual and initiated by the victim, *id.* ¶¶ 10, 29, while the victim claimed that the defendant had abruptly instigated and perpetrated the intercourse without her consent, *id.* ¶¶ 6–7, 29. Nonetheless, the victim's account contained some ambiguity surrounding the issue of her consent—she recounted that she "froze" during the intercourse, "neither actively participating in sex nor speaking any words," and otherwise expressed no other reaction. *Id.* ¶ 29 (quotation simplified). The supreme court determined that, had the jury been properly instructed, this evidence could have supported a reasonable determination that the defendant had mistaken the victim's reaction for consent. *Id.* ¶ 28. On that basis, the court reversed. *Id.* ¶ 32.

¶35 Here, the jury convicted Norton of two counts of aggravated sexual assault based upon vaginal intercourse and the sexual touching that occurred afterward in the bathroom. During trial, the parties presented the jury with two vastly differing versions of the events as to the element of consent. *See supra* ¶¶ 5–15. Wife testified that Norton forced her to submit to the sexual contact that occurred by threatening her with a gun when she refused to comply. Norton, on the other hand, testified that the intercourse was entirely consensual—that Wife, in fact, had initiated it—and, by his account, that the sexual touching in the bathroom did not occur at all.

¶36 While we cannot know precisely how the jury processed the two accounts, what we do know from the jury's decision is that it concluded that Norton sexually assaulted Wife at

gunpoint after breaking into her parents' house and kidnapping her, and despite her repeated expressions of nonconsent. *See Barela*, 2015 UT 22, ¶ 30 (using the jury's verdict to explain what elements the jury must have found). Norton must therefore demonstrate that, had the trial court properly instructed the jury, there is a reasonable likelihood that the verdict would have been different. *See Strickland v. Washington*, 466 U.S. 668, 694 (1984). To meet this burden, he must at least show that there is some rational basis in the evidence from which the jury could have concluded that, despite Wife's nonconsent and Norton's threats in the face of her protests, Norton nevertheless did not have the instructed mental state—intentional or knowing—as to her nonconsent. *See Barela*, 2015 UT 22, ¶¶ 26, 28–32; *Ochoa*, 2014 UT App 296, ¶¶ 6–7.

¶37     There is no such rational basis in the evidence. Norton provided no evidence to suggest that, despite threatening Wife under aggravating circumstances to force her compliance, he might have been mistaken about Wife's consent as to either instance of sexual assault; his testimony was that one incident was consensual, that the other did not occur, and that he did not use a gun or threaten Wife. Likewise, Wife provided no evidence from which a jury could reasonably find that Norton was mistaken as to her nonconsent. She testified that when she verbally expressed her nonconsent, he threatened her with a gun and thereafter ordered and physically forced her to comply with his demands, including the sexual touching that occurred in the bathroom.

¶38     Norton points to Wife's testimony that during intercourse she squeezed his penis, arguing it as a "scenario in which [he] may have mistakenly believed she consented," and one sufficient to provide the jury a rational basis from which to determine he did not have the requisite mental state. But as we recently observed in *State v. Reigelsperger*, 2017 UT App 101, 400 P.3d 1127, any actions on the part of the victim of alleged "cooperation cannot be viewed in a vacuum" but must instead

be viewed within the larger context in which they occur. *Id.* ¶ 85; *see Barela*, 2015 UT 22, ¶ 39 (explaining that "[t]o determine whether a victim has truly consented, the factfinder must pay close attention to the verbal and nonverbal cues given by the victim and to a wide range of other elements of context"). Indeed, "[w]hen refusals, rejections, or resistance are met with disregard, hostility, and commands to submit, any limited cooperation that immediately follows cannot be said, without more, to constitute consent." *Reigelsperger*, 2017 UT App 101, ¶ 85.

¶39 Even if squeezing Norton's penis could have somehow in isolation been interpreted by Norton as indicative of Wife's willing participation, the action occurred within the larger context of Norton breaking into his parents-in-law's house in the middle of the night, kidnapping Wife, threatening her, informing her that they were going to have intercourse after she asked him if he was going to rape her, and disregarding her repeated verbal refusals. *See id*. Furthermore, Wife also testified that after she squeezed his penis, Norton "grabbed both of [her] hands and just put them over [her] head in one of his hands," and even defense counsel during trial characterized Wife's action as one of protest, not participation.

¶40 Thus, there is no rational basis in the evidence to support a jury finding that Norton could have been mistaken about Wife's nonconsent. *See State v. Barela*, 2015 UT 22, ¶¶ 29–32, 349 P.3d 676. Accordingly, even if the instructions regarding the mens rea applicable to the element of nonconsent were erroneous, Norton has not demonstrated that he was harmed by the mistake. His claims of ineffective assistance of counsel, manifest injustice, and plain error on the basis of the mens rea instructions therefore fail. *See Archuleta v. Galetka*, 2011 UT 73, ¶ 41, 267 P.3d 232.

## II. Lesser Included Offense Instructions

¶41 Norton next argues that the trial court erred when it refused to instruct on his requested lesser included offenses. Specifically, he argues that the court erred when it refused to instruct the jury on (A) sexual battery as the lesser included offense of aggravated sexual assault, (B) unlawful detention as the lesser included offense of aggravated kidnapping, and (C) aggravated assault and assault as the lesser included offenses of aggravated burglary.

¶42 "A defendant's request for a lesser included offense instruction is evaluated under the evidence-based standard" found in Utah Code section 76-1-402. *See State v. Campbell*, 2013 UT App 23, ¶ 5, 295 P.3d 722 (quotation simplified). We apply a two-part test to determine whether a trial court must give a requested instruction. First, we determine under section 76-1-402(3) whether the lesser offense is included in the greater offense. Most often, this will require analyzing whether "some of their statutory elements overlap" and whether "the evidence at the trial of the greater offense includes proof of some or all of those overlapping elements." *State v. Baker*, 671 P.2d 152, 158–59 (Utah 1983); *see also* Utah Code Ann. § 76-1-402(3)(a) (LexisNexis 2012); *State v. Powell*, 2007 UT 9, ¶¶ 24–25, 154 P.3d 788 (explaining that a defendant's entitlement to a lesser included offense instruction "depend[s] on whether there exists some overlap in the statutory elements of allegedly included offenses and whether the same facts tend to prove elements of more than one statutory offense" (quotation simplified)).

¶43 Second, we determine under section 76-1-402(4) whether the evidence provides "a rational basis for a verdict acquitting the defendant of the offense charged and convicting him of the included offense." Utah Code Ann. § 76-1-402(4). In so doing, we must determine whether there is "a sufficient quantum of evidence presented to justify sending the question to the jury," *Baker*, 671 P.2d at 159, and we view the evidence "in the light

most favorable to the defendant requesting the instruction," *Powell*, 2007 UT 9, ¶ 27. Both parts of the test must be met "before the trial court must instruct the jury" regarding the lesser included offense. *Baker*, 671 P.2d at 159.

¶44 We address each requested lesser included offense instruction below.

A. Sexual Battery

¶45 Norton requested lesser included offense instructions on rape, forcible sexual abuse, and sexual battery for Counts 3 and 4—the aggravated sexual assault charges. The court instructed only rape as the lesser included offense for Count 3, and it instructed only forcible sexual abuse as the lesser included offense for Count 4. The court declined to instruct the jury on sexual battery for either count.

¶46 Norton contends that the failure to instruct on sexual battery for both counts was error because there is overlap in the elements of aggravated sexual assault[6] and sexual battery,[7] and

---

6. For aggravated sexual assaults based on the underlying offenses of rape and forcible sexual abuse, "[a] person commits aggravated sexual assault if: (a) in the course of a rape . . . or forcible sexual abuse, the actor: (i) uses, or threatens the victim with the use of, a dangerous weapon" or "(ii) compels, or attempts to compel, the victim to submit to rape . . . or forcible sexual abuse[] by threat of kidnaping, death, or serious bodily injury to be inflicted imminently on any person." Utah Code Ann. § 76-5-405(1)(a) (LexisNexis 2012).

7. A person commits sexual battery "if the person, under circumstances not amounting to," among other offenses, a rape or forcible sexual abuse or attempted rape or attempted forcible sexual abuse, "intentionally touches, whether or not through clothing, the anus, buttocks, or any part of the genitals of another

(continued…)

there is a rational basis in the evidence from which the jury could have acquitted him of aggravated sexual assault on both counts and instead convicted him of sexual battery. He essentially contends that there was a sufficient quantum of evidence developed at trial to create questions about his mental state as to Counts 3 and 4.

¶47    We disagree. Without deciding whether sexual battery is an included offense of aggravated sexual assault, we conclude that there was no rational basis in the evidence to acquit Norton of aggravated sexual assault and convict him instead of sexual battery. As we concluded above, *supra* ¶¶ 37–40, contrary to Norton's assertions, neither party presented evidence at trial to create a dispute about his mental state as to either the sexual intercourse or the sexual touching that occurred in the bathroom. *See State v. Oldroyd*, 685 P.2d 551, 555–56 (Utah 1984) (explaining that a defendant is entitled to a lesser included offense instruction where the evidence offered in the case places an element in dispute such that, based on that dispute, the jury could find a defendant guilty of a lesser offense and not of the greater); *State v. Baker*, 671 P.2d 152, 157 (Utah 1983) ("Thus, *where proof of an element of the crime is in dispute*, the availability of the 'third option' . . . gives the defendant the benefit of the reasonable doubt standard." (emphasis added)); *see also Keeble v. United States*, 412 U.S. 205, 213 (1973) (suggesting that where "the nature of petitioner's intent was very much in dispute at trial," the jury could have rationally convicted the petitioner of a requested lesser included offense with a lower intent "if that option had been presented"). Indeed, Norton's primary defense

--------

(…continued)

person, or the breast of a female person, and the actor's conduct is under circumstances the actor knows or should know will likely cause affront or alarm to the person touched." Utah Code Ann. § 76-9-702.1(1) (LexisNexis 2012). Sexual battery is "a class A misdemeanor." *Id.* § 76-9-702.1(3).

at trial was that Wife lied about the instances of sexual abuse to gain primary custody of their children. Norton made no assertion that, for example, despite Wife's alleged initiation of sexual intercourse, circumstances arose such that he might have been mistaken about Wife's consent or that he knew or should have known the continued sexual contact would cause affront or alarm to Wife. Nor did he make any statement or suggest any circumstances that might have created some ambiguity about his intent as to the sexual touching in the bathroom; by his account, Wife fabricated that touch.[8]

¶48　Therefore, the evidence about Norton's mental state on either count was not ambiguous, subject to any alternative interpretation, or quantifiably sufficient to entitle him to lesser included instructions on sexual battery. *See Baker*, 671 P.2d at 159 (explaining that a lesser included offense instruction must be given when "there is a sufficient quantum of evidence to raise a jury question regarding a lesser offense" or "the evidence is ambiguous and therefore susceptible to alternative interpretations, and one alternative would permit acquittal of the

---

8. On appeal, Norton also challenges the trial court's refusal to instruct on sexual battery for Count 4 by questioning the sufficiency of the evidence to establish his intent. He argues that "there was little if any evidence that Norton touched [Wife's] vagina" with the required intent, where Wife's testimony was that Norton inserted his fingers in her vagina for the purpose of "wip[ing] away his DNA." But Norton conceded a sufficiency of the evidence argument below; indeed, at the close of the State's case, defense counsel stated that he recognized that "there's sufficient evidence with regard to each of the elements in this case" and thereby declined to "make a motion for a judgment as a matter of law." And, apart from his sufficiency argument, Norton has not shown that, based on the evidence at trial, he was entitled to a lesser included offense instruction for sexual battery on this count.

greater offense and conviction of the lesser"). As a result, the jury would have had to impermissibly speculate about Norton's mental state to acquit him of aggravated sexual assault and convict of sexual battery on both counts. *See State v. Reece*, 2015 UT 45, ¶ 30, 349 P.3d 712 (explaining that "a defendant's request for a lesser included offense instruction cannot be based on sheer speculation" (quotation simplified)); *State v. Garcia-Vargas*, 2012 UT App 270, ¶¶ 17–18 & n.5, 287 P.3d 474 (indicating that, to create a dispute about mental state sufficient to entitle the defendant to lesser included offense instructions, there must be actual evidence presented to the jury to suggest a dispute about mental state); *see also Baker*, 671 P.2d at 157.

¶49   Accordingly, we conclude that the trial court did not err in declining to instruct the jury on sexual battery as to Counts 3 and 4.

B.     Unlawful Detention

¶50   Next, Norton argues that the court erred when it refused to instruct the jury on unlawful detention[9] as a lesser included offense of aggravated kidnapping. He contends that such an instruction was warranted because the statutory elements of aggravated kidnapping and unlawful detention overlap[10] and

---

9. A person commits the crime of unlawful detention when that person "intentionally or knowingly, without authority of law, and against the will of the victim, detains or restrains the victim under circumstances not constituting a violation of: (a) kidnapping, . . . or (c) aggravated kidnapping." Utah Code Ann. § 76-5-304(1) (LexisNexis 2012).

10. Norton argues that unlawful detention qualifies as a lesser included offense of aggravated kidnapping because it is statutorily defined as such. However, even if unlawful detention *could* qualify as an included offense under statute, as we discuss

(continued…)

because there was a basis in the evidence to justify the instruction. Specifically, Norton refers to his testimony where he described restraining Wife's hands at the Fort Douglas office building. According to Norton, after he and Wife engaged in consensual sexual intercourse, they argued over custody and the argument "became physical." He testified that Wife hit him, he backhanded her, and then, for about "a minute," he grabbed Wife's hands to stop her from hitting him again. He contends that if the jury believed this testimony, it would have been rational for it to find that he "merely detained or restrained" Wife and to convict him of unlawful detention instead of aggravated kidnapping or kidnapping.

¶51    Norton's argument is misplaced. To determine that a defendant was entitled to a lesser included offense instruction, we must determine, among other things, that the "*same facts* tend to prove elements of more than one statutory offense." *State v. Powell*, 2007 UT 9, ¶¶ 24–25, 154 P.3d 788 (emphasis added) (quotation simplified); *see also* Utah Code Ann. § 76-1-402(3)(a) (LexisNexis 2012) (identifying a lesser included offense as one "established by proof of the same or less than all the facts required to establish the commission of the offense charged"). But Norton has not demonstrated that the "same facts" relied on by the State to establish the offense of aggravated kidnapping also tend to prove the elements of unlawful detention. Instead, Norton wrongly claims entitlement to a lesser included offense instruction by pointing to evidence that is distinct from the evidence developed at trial to establish the greater offense.

---

(…continued)

below, an included offense cannot be based upon different facts than the greater offense. And here, the facts the State proffered to establish aggravated kidnapping and the facts Norton proffers on appeal to establish unlawful detention are not the same.

¶52    To prove the charge of aggravated kidnapping, the State presented evidence that Norton duct-taped Wife's head and mouth, took her from her parents' house, and, while threatening her with a gun, drove her to the Fort Douglas office building where he sexually assaulted her. Norton does not contend that these facts—or a subset of these facts—justifies an unlawful detention instruction. Instead, Norton describes an entirely separate event at the Fort Douglas office building where he allegedly restrained Wife by holding her hands for about "a minute." But the State did not rely on this event to prove the greater offense of aggravated kidnapping, nor did the State charge Norton for this act.

¶53    Thus, Norton cannot demonstrate that the lesser offense of unlawful detention is established by proof of the same or less than all the facts required to prove the offense for which he was charged. *See Powell*, 2007 UT 9, ¶¶ 24–25 & n.21. If anything, the event Norton describes could more appropriately labeled a possible separate offense, not a lesser included offense that would warrant a lesser included offense instruction. *Cf. State v. Branch*, 743 P.2d 1187, 1191 (Utah 1987) (explaining that an offense is not lesser included if it is a separate offense "committed within the same criminal episode" that is based on "proof [of] different evidence"); *State v. Garrido*, 2013 UT App 245, ¶ 31, 314 P.3d 1014 (stating that "[e]ven if there is overlap in the statutory elements, if the convictions rely on materially different acts, then one crime will not be a lesser included offense of another" (quotation simplified)); *State v. Smith*, 2003 UT App 179, ¶ 16, 72 P.3d 692 (concluding that one offense was not the lesser included of another where the State relied on "materially different acts" to prove two separate offenses); *State v. Mane*, 783 P.2d 61, 63, 65–66 (Utah Ct. App. 1989) (concluding separate acts that were part of a single criminal episode were separate offenses requiring proof of different evidence and therefore did not stand in the relationship of greater and lesser offenses). Accordingly, the court did not err in declining to give the requested unlawful detention instruction.

C.      Aggravated Assault and Assault

¶54     Finally, Norton argues that the court erred by not instructing the jury on aggravated assault and assault[11] as lesser included offenses of aggravated burglary.[12] He contends that elements of aggravated assault and assault overlap with those of aggravated burglary and that there was a rational basis in the evidence to support giving those instructions. Specifically, he contends that it would have been rational for the jury to acquit him of aggravated burglary but convict him of aggravated assault or assault on the basis of his entry of the Fort Douglas office building. He alleges that the jury could have determined

---

11. At the time of Norton's conduct, the aggravated assault statute provided that an aggravated assault occurs "if the person commits assault . . . and uses: (a) a dangerous weapon . . . ; or (b) other means or force likely to produce death or serious bodily injury." Utah Code Ann. § 76-5-103(1) (LexisNexis 2012).

　　　　 Similarly, at the time of Norton's conduct, an assault was "(a) an attempt, with unlawful force or violence, to do bodily injury to another; (b) a threat, accompanied by a show of immediate force or violence, to do bodily injury to another; or (c) an act, committed with unlawful force or violence, that causes bodily injury to another or creates a substantial risk of bodily injury to another." *Id.* § 76-5-102(1).

12. Aggravated burglary occurs when a person "in attempting, committing, or fleeing from a burglary . . . (a) causes bodily injury to any person who is not a participant in the crime; (b) uses or threatens the immediate use of a dangerous weapon against any person who is not a participant in the crime; or (c) possesses or attempts to use any explosive or dangerous weapon." *Id.* § 76-6-203(1) (2012). Burglary occurs when an actor "enters or remains unlawfully in a building or any portion of a building with intent to commit," among other things, a felony or "an assault on any person." *Id.* § 76-6-202(1).

that backhanding Wife during the mutual argument over custody he contends occurred in that building constituted aggravated assault or assault. Further, he claims that the jury could have acquitted him of aggravated burglary by finding that he "did not enter [the building] unlawfully." Either way, Norton claims, if the jury believed that he backhanded Wife in the Fort Douglas office building with the requisite intent, aggravated assault or assault would have been the "appropriate verdict."

¶55　Like we concluded about Norton's unlawful detention argument, we conclude that aggravated assault and assault are not lesser included offenses of aggravated burglary under the facts of this case. The evidence developed by the State to establish the greater offense of aggravated burglary and the evidence Norton relies upon to claim entitlement to lesser included offense instructions are materially different. *See Powell*, 2007 UT 9, ¶¶ 24–25. The State's entire case related to the aggravated burglary charge centered only on Norton's entry of his parents-in-law's house at the beginning of the night. The State made no allegation and presented no facts or evidence at trial that Norton's entry of the *Fort Douglas office building* was unlawful or formed the basis of the aggravated burglary charge; indeed, the State specifically argued that Norton "entered or remained unlawfully in the building—the building being the house."

¶56　Norton cannot prove entitlement to lesser included offense instructions by pointing to facts and evidence that are factually distinct from and center upon entirely different alleged incidents than those offered to establish the greater offense. *See id.*; *cf. Garrido*, 2013 UT App 245, ¶ 31; *Smith*, 2003 UT App 179, ¶ 16. Because the facts and evidence developed to establish the greater offense of aggravated burglary were different from the facts and evidence relied upon by Norton to claim entitlement to the lesser included offense instructions of aggravated assault and assault, those lesser offenses were not included within the

greater offenses. *Powell*, 2007 UT 9, ¶¶ 24–25. Accordingly, the court did not err in declining to give the requested instructions.[13]

## III. Sentencing

¶57 Finally, Norton argues that his sentence was erroneous for two reasons. First, he argues that sentencing him for the

---

13. In a footnote, Norton also contends that his counsel was ineffective for "failing to request criminal trespass as an additional lesser-included offense of aggravated burglary" because the jury could have believed his testimony that he did not break into his parents-in-law's house at the beginning of the night, but that he was guilty of criminal trespass because he was "not justified in breaking into [Wife's parents'] house after [Wife] locked herself out or that he remained at the house unlawfully after he and [Wife] resumed arguing and [Wife] ordered him to leave."

For similar reasons that we concluded Norton was not entitled to the requested aggravated assault and assault instructions, we conclude that based on *Strickland v. Washington*, 466 U.S. 668 (1984), his counsel was not ineffective for failing to request that the jury be instructed on criminal trespass as a lesser included offense of aggravated burglary. Here, the evidence Norton relies upon is different—in time and in substance—from the evidence developed to establish the greater offense. The State's entire case for aggravated burglary was based on events that occurred when Norton retrieved Wife from her parents' house at the beginning of the night. Accordingly, criminal trespass was not an included offense of aggravated burglary under the circumstances of this case, and Norton's counsel was therefore not ineffective for failing to request criminal trespass as a lesser included instruction. *See State v. Calvert*, 2017 UT App 212, ¶ 22, 407 P.3d 1098 (explaining that "counsel's failure to make a motion that would be futile if raised does not constitute deficient performance").

aggravated sexual assault convictions under the highest sentencing tier violated his rights to due process and a jury trial. Second, he argues that the court abused its discretion in imposing two fifteen-years-to-life terms for the aggravated sexual assault convictions because the court did not conduct the "statutorily mandated interests-of-justice analysis." We address each argument below.

A.    Sentencing Tier

¶58    The jury convicted Norton of two counts of aggravated sexual assault based upon Wife's testimony describing nonconsensual intercourse and Norton inserting his fingers into her vagina. During sentencing, Norton contended that, because there was no special verdict form and the instructions allowed the jury to convict him if it found that he had committed attempted rather than completed acts of rape or forcible sexual abuse, the court should sentence him as though the jury had found him guilty of committing the lowest culpable underlying offense in the aggravated sexual assault statute—attempted forcible sexual abuse. The court disagreed and instead sentenced Norton on those counts each to the presumptive fifteen years to life sentences for completed acts of rape and forcible sexual abuse—the highest tier of sentencing available under the statute. *See* Utah Code Ann. § 76-5-405(2) (LexisNexis 2012). In doing so, the court determined that sentencing in that way achieved "fundamental fairness" with no "denial of any due process or right" because there was no evidence in the record to support a conclusion that Norton's actions constituted mere attempts.

¶59    On appeal, Norton contends this was error. He frames his challenges under his constitutional rights to a jury trial and due process.[14] As we understand it, his argument is that, because

---

14. Norton references both the United States and the Utah Constitutions in making this claim. However, Norton "has not

(continued…)

there was no special verdict form and the trial court instructed the jury that it could convict him for attempts as well as completed acts, sentencing him under the highest tier violated his "rights to due process and to a jury trial because it increased [his] minimum mandatory sentence without a jury verdict on each of the elements required to increase the sentence." He contends that attempted forcible sexual abuse was the only "version of the offense for which the record showed that the jury found [him] guilty of each element of the offense beyond a reasonable doubt."[15] In essence, then, Norton seems to argue that, in choosing to sentence him under the highest tier, the court impermissibly increased the penalty he would have received had he been sentenced according to the facts that he claims were reflected in the jury's verdict. In this way, the sentence violated his rights to due process and a jury trial because the court based its sentence on facts that the jury did not find beyond a reasonable doubt.

---

(…continued)

adequately set forth any separate legal analysis" under the due process or the right to jury trial provisions of the Utah Constitution. *See State v. Marshall*, 2003 UT App 381, ¶ 8 n.2, 81 P.3d 775 (quotation simplified). Accordingly, we do not separately analyze Norton's state constitutional claims. *See id.*

15. The State argues that Norton has not preserved his argument for appeal. We disagree. Norton argues on appeal that the court erred when it declined to sentence him according to the lowest tier of the aggravated sexual assault sentencing hierarchy for Counts 3 and 4 because doing so violated his rights to due process and a jury trial. He made these same arguments to the court below, and the court ultimately determined that, given the evidence, there was no denial of due process or fundamental fairness by sentencing Norton for committing the underlying offenses of rape and forcible sexual abuse.

¶60 Norton is correct that he is entitled to a jury trial on all of the elements of the crimes for which he is charged and that he cannot be convicted for the charged crimes unless there is "proof beyond a reasonable doubt of every fact necessary to constitute" them. *See State v. Palmer*, 2009 UT 55, ¶ 11 & n.17, 220 P.3d 1198 (quotation simplified); *State v. Reyes*, 2005 UT 33, ¶ 11, 116 P.3d 305; *see also Apprendi v. New Jersey*, 530 U.S. 466, 476–77 (2000) (explaining that the rights to a jury trial and to due process, "[t]aken together, . . . indisputably entitle a criminal defendant to a jury determination that he is guilty of every element of the crime with which he is charged, beyond a reasonable doubt" (quotation simplified)). Norton is also correct that these rights are implicated in sentencing cases "whenever a judge seeks to impose a sentence that is not solely based on facts reflected in the jury verdict or admitted by the defendant." *Palmer*, 2009 UT 55, ¶ 12 (quotation simplified). For example, a sentencing court may not make additional factual findings that ultimately "expose[] the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Apprendi*, 530 U.S. at 483 & n.10 (quotation simplified); *see also id.* at 490.

¶61 Here, although Norton argues that the jury's verdict reflected convictions beyond a reasonable doubt of two counts of only attempted[16] forcible sexual abuse and that the court erred in not sentencing him accordingly, we conclude that the court did not err in sentencing him under the highest tier of the

---

16. An attempt occurs if a person "engages in conduct constituting a substantial step toward commission of the crime" and "intends to commit the crime; or . . . when causing a particular result is an element of the crime, he acts with an awareness that his conduct is reasonably certain to cause that result." Utah Code Ann. § 76-4-101 (LexisNexis 2012).

aggravated sexual assault statute.[17] We must assume that the jury convicted Norton of the act or acts for which the evidence was sufficient. *See State v. Isom*, 2015 UT App 160, ¶ 27, 354 P.3d 791 (stating that a jury must "decide the case on the evidence" presented about the charged crime (quotation simplified)); *see also United States v. Self*, 2 F.3d 1071, 1093 (10th Cir. 1993) (stating that, in determining whether reversal is necessary when a general verdict is returned where more than one theory is advanced, "factual insufficiency" of one of the theories advanced will not require reversal "as we will presume that the jury rejected the factually inadequate theory and convicted on an alternative ground for which the evidence was sufficient");

---

17. In making his argument, Norton relies heavily on decisions such as *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *State v. Lopes*, 1999 UT 24, 980 P.2d 191, in which the respective courts determined that due process and the right to a jury trial are violated when a sentencing court finds facts distinct from those of the convicted crime that increase the allowable penalty for that crime but have not been proven by the State beyond a reasonable doubt or submitted to a jury. *See Apprendi*, 530 U.S. at 476–90; *Lopes*, 1999 UT 24, ¶¶ 13–17, 22. However, other than citing those cases, Norton does not explain how or why that jurisprudence applies in the circumstances of his case, particularly where the trial court submitted the elements and the evidence proffered to support conviction for completed acts of rape and forcible sexual abuse to the jury for determination. And, as we discuss below, he does not identify the record evidence that supports his contention that the jury's verdict could reflect only convictions of attempted forcible sexual abuse for those counts. In any event, we ultimately conclude that the sentencing court did not err when it sentenced Norton under the highest tier of the aggravated sexual assault sentencing hierarchy. But in doing so, we express no opinion on whether the *Apprendi* and the *Lopes* lines of cases apply to the circumstances present here.

*cf. State v. Fedorowicz*, 2002 UT 67, ¶ 40, 52 P.3d 1194 (noting that, in reviewing an evidentiary challenge to a verdict, we "assume that the jury believed the evidence that supports the verdict"); *Madsen v. Brown*, 701 P.2d 1086, 1092 (Utah 1985) (explaining that a jury's verdict must have "foundation in the evidence" and may not be "based on evidence so fragmentary that no reasonable minds could have so concluded"). And we cannot discern from our review of the record any factual basis—and Norton does not identify such a factual basis—to support a conclusion that the jury could have determined that the sexual acts underlying Counts 3 and 4 constituted only attempted forcible sexual abuse. *See United States v. Barnes*, 158 F.3d 662, 667–68 (2d Cir. 1998) (noting that the evidence of conspiracy to possess marijuana was legally insufficient and that it was "inconceivable that the jury could have convicted" on that basis, but assuming that "the jury convicted the defendant of conspiring to possess at least one of those controlled substances as to which the evidence was sufficient"); *cf. State v. Peterson*, 881 P.2d 965, 968–70 & n.3 (Utah Ct. App. 1994) (concluding that the defendant was not entitled to lesser included offense instructions for, among other things, attempted aggravated burglary, burglary, and criminal trespass, where the trial court determined that "there was no credible testimony" contradicting the fact that the defendant actually entered the residence at issue in the case, and noting that "[i]f entry occurred, the attempt offenses would logically be excluded" as appropriate lesser included offenses).

¶62 For the conviction pertaining to Count 3, the sexual intercourse count, there is no evidence in the record to support a conclusion that the jury's guilty verdict reflected a finding beyond a reasonable doubt of an underlying aggravated sexual assault offense other than rape. The trial court instructed the jury that this count pertained to the "allegation of sexual intercourse," and it was undisputed at trial that the sexual intercourse occurred. Both Norton and Wife unequivocally testified that it did; thus, at trial, the only question for the jury was whether the intercourse amounted to rape or consensual

intercourse, not whether Norton attempted but failed to engage in intercourse with Wife.

¶63    Other evidence presented during trial also demonstrated that this count pertained to a completed act of sexual intercourse as opposed to an act of attempted sexual touching or an attempted taking of "indecent liberties." *See* Utah Code Ann. § 76-5-404(1) (LexisNexis 2012) (providing that forcible sexual abuse involves touching "the anus, buttocks, or any part of the genitals of another, or touch[ing] the breast of a female, or otherwise tak[ing] indecent liberties with another" in circumstances "*not amounting to rape . . . or attempted rape*" (emphasis added)); *id.* § 76-5-402(1) (providing that "[a] person commits rape when the actor has sexual intercourse with another person without the victim's consent"). For example, both parties stipulated that the vaginal swabs performed on Wife after the incident tested positively for semen and that Norton's DNA was found in that semen. And Norton has not pointed to any evidence that potentially created any ambiguity as to the factual question of whether the sexual assault was an attempted forcible sexual abuse as opposed to a completed rape. *Cf. State v. Barela*, 2015 UT 22, ¶¶ 28–32, 349 P.3d 676 (explaining that reversal on the basis of erroneous jury instructions was appropriate where the evidence in the record created some ambiguity as to whether the defendant might have been mistaken about the victim's nonconsent); *Peterson*, 881 P.2d at 968–70 & n.3. As a result, under the circumstances of this case, "we refuse to indulge the assumption" that the jury's verdict could have been based on a finding of an underlying aggravated sexual assault offense other than a completed rape. *See Barnes*, 158 F.3d at 668. Thus, the sentencing court did not err in concluding that the jury's verdict on this count reflected a finding of guilt that Norton completed the act of rape and in sentencing him accordingly.

¶64    Likewise, for Count 4, the allegation pertaining to Norton's penetration of Wife's vagina with his fingers, there is

no evidence in the record to suggest that the jury's guilty verdict reflected conviction of an attempted rather than a completed forcible sexual abuse. The dispute at trial centered on whether the incident occurred at all, not whether the touching was completed rather than attempted. Wife testified that it did occur—she claimed that Norton inserted his fingers when he ordered her to shower and rinse herself off after raping her. Norton denied it by testifying that Wife voluntarily showered after the sexual intercourse and that his participation was limited to turning on the faucet and handing her paper towels with which to dry off. And other than his denial, there was no evidence creating ambiguity about the factual question of whether Norton merely attempted, as opposed to completed, the alleged abuse. *Cf. Barela*, 2015 UT 22, ¶¶ 28–32; *Peterson*, 881 P.2d at 968–70 & n.3.

¶65   As a result, there was no room in the narratives for the jury to have concluded the truth lay somewhere between the two accounts. *Cf. Barela*, 2015 UT 22, ¶¶ 28–32 (reversing based on an erroneous jury instruction where there was evidence in the record that could have permitted the jury to conclude that "the truth fell somewhere in between the two accounts" provided by the defendant and the victim during trial). Thus, even though the jury was free to believe or disbelieve either Wife's or Norton's account, neither narrative gave the jury a basis from which to conclude that the sexual abuse on this count was only an attempt. *See Madsen*, 701 P.2d at 1092 (explaining that a jury's verdict must have its "foundation in the evidence"). In these circumstances, we can conclude only that, by convicting instead of acquitting Norton on this count, the jury's verdict reflected a finding of guilt beyond a reasonable doubt on the basis of a completed act of forcible sexual abuse.[18] *See Isom*, 2015 UT App 160, ¶ 27.

---

18. Norton also suggests that the lack of a special verdict form somehow played into the deprivation of his rights. Our supreme

(continued…)

¶66    For these reasons, we conclude that the sentencing court did not err when it determined that the facts reflected in the jury's verdict amounted to convictions for a completed rape and completed forcible sexual abuse and thereafter sentenced him under the highest tier of the aggravated sexual assault sentencing hierarchy.

B.    Interests of Justice

¶67    Norton contends that the trial court abused its discretion by declining to reduce in the interests of justice the presumptive fifteen years to life sentences for the two counts of aggravated sexual assault, as permitted by Utah Code section 76-5-405. Norton argues that the court exceeded its discretion by not conducting the required interests of justice analysis set out by our supreme court in *LeBeau v. State*, 2014 UT 39, 337 P.3d 254. He asks that we remand the case for a new sentencing hearing, "with an order that the court conduct a complete interests-of-justice analysis."

---

(…continued)

court has recently reiterated that a special verdict form, while permitted, is not required. *State v. Hummel*, 2017 UT 19, ¶ 50, 393 P.3d 314. But even if we assume a special verdict form should have been employed in this case, for the same reasons explained above, we cannot conclude that Norton was harmed by its absence. Because there was no basis in the evidence for the jury to have determined as a factual matter that Norton committed only attempted forcible sexual abuse on Counts 3 and 4, employing a special verdict form could not have provided Norton the relief he now seeks—being sentenced as though he committed only attempted forcible sexual abuse. *See State v. Isom*, 2015 UT App 160, ¶ 27, 354 P.3d 791 (stating that the jury's duty is to "decide the case on the evidence" through a "disinterested, impartial and fair assessment of the testimony that has been presented" (quotation simplified)).

¶68 Generally, "a trial court's sentencing decision will not be overturned unless it exceeds statutory or constitutional limits, the judge failed to consider all the legally relevant factors, or the actions of the judge were so inherently unfair as to constitute abuse of discretion." *State v. Jaramillo*, 2016 UT App 70, ¶ 32, 372 P.3d 34 (quotation simplified). In reviewing the sentence imposed, we will "presume that the sentencing court made all the necessary considerations," *State v. Alvarez*, 2017 UT App 145, ¶ 4, 402 P.3d 191 (quotation simplified), unless the appellant successfully demonstrates the presence of circumstances to overcome that presumption, *State v. Helms*, 2002 UT 12, ¶ 11, 40 P.3d 626 (noting that situations in which this presumption should not apply "are normally limited to [those] where (1) an ambiguity of facts makes the assumption unreasonable, (2) a statute explicitly provides that written findings must be made, or (3) a prior case states that findings on an issue must be made"). "Absent these circumstances, we will not assume that the trial court's silence, by itself, presupposes that the court did not consider the proper factors as required by law. To do so would trample on the deference this court usually gives to the sentencing decisions of a trial court." *Id.*

¶69 Utah Code section 76-5-405 provides that the presumptive prison sentence for a person convicted for aggravated sexual assault on the basis of a completed act is fifteen years to life. *See* Utah Code Ann. § 76-5-405(2)(a)(i) (LexisNexis 2012). However, a sentencing court may reduce the presumptive prison term to either ten years to life or six years to life if it determines that a "lesser term . . . is in the interests of justice." *See id.* § 76-5-405(3)(a). In *LeBeau*, our supreme court held that the sentencing court must conduct an interests of justice analysis for offenses that permit a reduction on that basis before imposing the presumptive sentence for convictions of certain offenses, like aggravated sexual assault. 2014 UT 39, ¶¶ 21, 24; *see also id.* ¶ 29 (observing that the legislature added the interests of justice analysis in 2007 "as part of a sweeping revision of the penalties associated with sexual offenses and kidnapping," including the

offense of aggravated sexual assault, and that in each offense, the legislature "instructed sentencing courts to consider whether the interests of justice warranted a lesser sentence" than the presumptive sentence). The interests of justice analysis requires a sentencing court to consider the proportionality of the sentence to the offense and the defendant's rehabilitative potential. *Id.* ¶ 37.

¶70 First, the court must consider "the proportionality of the defendant's sentence in relation to the severity of his offense." *Id.* ¶¶ 36–37. In this regard, the court must consider the "gravity of the offense and the harshness of the penalty." *Id.* ¶ 42 (quotation simplified). The supreme court has identified the Utah Sentencing Commission's list of aggravating and mitigating circumstances as "a good starting point," while instructing that courts should also "consider all relevant facts raised by the parties about the defendant's crime in relation to the harshness of the penalty," such as the nature and magnitude of the crime, the "culpability of the offender," and the offender's motivation. *Id.* ¶¶ 42–46. Proportionality also requires the court to "compare the sentence being imposed to the sentences imposed for other crimes in Utah" so as to avoid arbitrary sentencing disparities. *Id.* ¶¶ 41, 47; *see also State v. Martin*, 2017 UT 63, ¶ 61 (stating that the "ultimate question at this stage . . . should be whether the overall sentence that the court plans to impose will be unusually high or low compared with the typical sentences for approximately similar offenses"). *But see Martin*, 2017 UT 63, ¶¶ 64–66 (explaining that, because this "is a daunting task," it is not one "that we can require our district courts to perform without prompting or guidance from counsel").

¶71 The court must also "appropriately weigh a defendant's potential for rehabilitation," which includes considering "all of the factors relevant to a defendant's rehabilitative potential" and taking into consideration the Board of Pardons and Parole's (the Board) role in our indeterminate sentencing scheme to monitor a defendant's behavior and accordingly adjust the maximum

sentence. *LeBeau*, 2014 UT 39, ¶¶ 37, 52, 54. Some factors that have bearing on a defendant's rehabilitation potential are the defendant's age, "the extent to which a defendant's crime was tied to alcohol or drug addiction," "the defendant's prospects for treatment," "[t]he extent to which a defendant's criminal history evidences continual violence," and the Sentencing Commission's guidelines as related to the defendant's "capacity for rehabilitation." *Id.* ¶ 54.

¶72 Norton asserts that the court failed to consider both the proportionality of his sentence and his potential for rehabilitation. With the above principles in mind, we address each below.

### 1. Proportionality

¶73 Norton argues that although the court considered the severity of his conduct, it did not consider whether the presumptive sentence was a proportional penalty for both convictions of aggravated sexual assault. He contends that the court did not conduct the proportionality analysis required by *LeBeau* and instead merely "assumed that [his] conduct merited a 15-years-to-life sentence and imposed sentence based on its assessment of whether [he] was entitled to 'mercy.'" He also contends that, under the circumstances of this case, his aggravated sexual assault convictions are comparatively less serious than other crimes, such as murder, which also carry presumptive prison sentences of fifteen years to life.

¶74 We conclude that Norton's contentions do not have merit. To begin with, Norton is correct that the court did not expressly explain its sentencing decision in terms of the proportionality rubric set out in *LeBeau*. But although Norton asked the court to reduce his sentence in the interests of justice, "he did not invoke the proportionality rubric in making his argument" for a reduced sentence. *See State v. Alvarez*, 2017 UT App 145, ¶ 5, 402 P.3d 191. Instead, Norton referred to subsection (3)(a) but then proceeded to provide the court only with considerations relating

to his past and his rehabilitative potential that he claimed justified a departure from the presumptive sentence. At no time did Norton invoke the proportionality rubric set out in *LeBeau* or object to the court's analysis for failing to explain the sentence it imposed in those terms. As a result, Norton cannot "now be heard to argue that the sentencing court was remiss in not articulating its views on proportionality." *See id.* ¶¶ 4–5 & n.4.

¶75 Moreover, there is no evidence to support Norton's contention that the court imposed its sentence by merely assuming that his conduct merited the presumptive sentence, without taking into account the relevant proportionality considerations presented by the parties. Rather, it is apparent from the sentencing transcript that the court, based upon the information provided to it, did consider whether the presumptive sentence was a proportional penalty to Norton's crimes. *See LeBeau v. State*, 2014 UT 39, ¶¶ 42, 46, 337 P.3d 254 (explaining that "courts should consider all relevant facts *raised by the parties* about the defendant's crime in relation to the harshness of the penalty," and reiterating that, even under an interests of justice analysis, "sentencing remains a highly fact-dependent endeavor" for which there is no "exhaustive list of factors" (emphasis added)).

¶76 First, the court indicated it had reviewed the PSI and the attached letters, which included extensive information regarding the aggravating and mitigating circumstances in the case as well as information regarding the violent nature of the aggravated sexual assaults, Norton's culpability in perpetrating them, and an ultimate recommendation for the statutory prison sentence on each count. The court also heard from both parties regarding their recommended sentence and the reasons for the recommendations. We presume that the court duly considered all such information in rendering its sentencing decision. *State v. Helms*, 2002 UT 12, ¶ 11, 40 P.3d 626; *accord State v. Moa*, 2012 UT 28, ¶ 35, 282 P.3d 985.

¶77    Further, the court explained its decision to impose the presumptive sentence by highlighting the various factors it recognized to be in play and explaining why it believed Norton's requested reduction was inappropriate in light of the circumstances. The court stated that, in its view, the case was "not a probation case." The court noted that Norton had had a "good past in many, many ways," with "very little that's negative," and that it recognized that "a marriage break up is complicated and difficult." It also recognized that the convictions resulted from "a concrete discrete event that took hours and not days." Yet the court explained that it accepted the jury's verdict, which demonstrated the jury's rejection of Norton's narrative of the events, and expressed its belief that the events did not happen at all the way Norton contended. In this regard, the court observed that Norton's conduct was "way, way, way over the line" and not of a kind that "our society can tolerate." The court explained that Norton was "entitled to some mercy, but not what [his] lawyer is asking and not what [Norton was] asking." It concluded that in the balance, given the severity of Norton's conduct and the "great" harm he inflicted, "a 15 to life term covers it."

¶78    Norton has not demonstrated this analysis was improper in light of the information presented to the court for sentencing. *See LeBeau*, 2014 UT 39, ¶ 42 (explaining that a court must consider all information related to proportionality that is "raised by the parties"). And to the extent that Norton disagrees with the court's weighing of the various factors presented to it regarding proportionality, Norton cannot demonstrate an abuse of discretion merely by disagreeing with the court's analysis or arguing on appeal that the court ought to have weighed certain factors more heavily.[19] *Alvarez*, 2017 UT App 145, ¶ 5.

---

19. Norton also asserts that the presumptive sentence was inappropriate because "the jury rejected [Wife's] testimony that Norton used a gun," the sexual assaults "did not rise to the level

(continued…)

¶79    Norton also contends that the court failed to compare his sentence with sentences imposed for other similar crimes. But Norton did not provide the court with comparative information regarding whether the presumptive sentence would "be unusually high or low compared with the typical sentences for approximately similar offenses." *State v. Martin*, 2017 UT 63, ¶ 61. Norton contended during the sentencing hearing that the "Court has seen some very serious and egregious offenses," and that "this case does not rise to the level of the kinds of egregious cases where we have individuals who suffered significant loss of life or impairment." Other than this imprecise assertion, he did not request that the court compare the presumptive sentence to

———————————————

(…continued)
of murder or aggravated sexual abuse of a child," and they did not "result in serious bodily injury." Contrary to Norton's assertions, the jury's verdict of aggravated sexual assault demonstrates that, at least as to the sexual assaults, the jury found that Norton perpetrated them under aggravating circumstances, and Norton has not challenged the sufficiency of the evidence regarding the aggravating factor for either aggravated sexual assault conviction on appeal. In light of the presence of an aggravating factor, we also reject Norton's contention that the court could not impose the presumptive sentence absent evidence of serious bodily injury. As the supreme court observed in *LeBeau v. State*, 2014 UT 39, 337 P.3d 254, in establishing the sentencing scheme for sexual offenses, the legislature "signaled its judgment that sexual crimes, which intrude on the fundamental bodily integrity of the victim like no others short of murder, are serious enough to warrant a sentence of [life without parole]" and that sexual crimes "represent an especially heinous form of bodily insult." *Id.* ¶¶ 49–50. Certainly, it is not beyond the pale for a sentencing court to conclude that in certain cases a sexual assault perpetrated under aggravating circumstances merits imposition of the presumptive fifteen years to life sentence.

other sentences imposed for similar crimes or provide the court with any actual comparisons of typical sentences for similar offenses to assist the court. In these circumstances, we will not fault the court for failing to conduct a sua sponte review of the Utah Code to "identify similar offenses" and then "compare their sentencing schemes to the sentence" it intended to impose on Norton. *See id.* ¶ 66 (explaining that this is "not a task that we can require our district courts to perform without prompting or guidance from counsel"). Nor will we shoulder the burden on appeal of "scouring the criminal code" in an effort to determine other sentencing schemes the court "ought to have considered in assessing the propriety of the sentence it imposed." *See id.* ¶ 65.[20]

2.      Rehabilitation

¶80    Norton also argues that the sentencing court failed to consider his potential rehabilitation in imposing the presumptive prison terms. In particular, he claims that the sentencing court failed to consider all the relevant factors and the Board's role in determining his maximum sentence. He also contends that the court wrongly rejected much of the mitigating evidence.

¶81    We disagree. Norton has not rebutted the presumption that the court duly considered all of the information the parties presented with bearing on his rehabilitative potential. *See State v. Jaramillo*, 2016 UT App 70, ¶¶ 41–42, 372 P.3d 34 (presuming that a court considers the factors presented to it regarding a defendant's potential for rehabilitation). As discussed above, the

---

20. Norton also contends that the court inappropriately applied principles of deterrence to reach its sentencing decision. Norton did not object on this basis below or suggest to the court that, when conducting an interest of justice analysis, applying principles of deterrence is inappropriate. As a result, we consider this argument waived and do not address it further. *See State v. Johnson*, 2017 UT 76, ¶ 16 n.4.

court "had the benefit of [the PSI] containing information about [Norton's] criminal and personal history." *See id.* ¶ 42. During sentencing, the court was also provided further information regarding Norton's potential for rehabilitation. Norton contended that his lack of criminal history, his desire to move forward productively in his life, his age, his acceptance that his relationship with Wife had ended, his amenability to supervision, and his desire to be released in "such a time that he could support his children," all justified a sentence reduction. He also cited letters submitted in support, which he contended showed that he had been a contributing community member before the incident. In contrast, the State contended that Norton's crimes had been "terrible" and violent, and it emphasized the fact that Norton had failed to take any responsibility for his actions and that he continued to maintain his "bogus" story. Wife's attorney addressed the court and expressed that, contrary to his contentions, Norton had shown himself to be unamenable to court supervision by blatantly defying the protective order that had been in place the night of the events. Wife also made a statement, reiterating her concern for her and her family's safety if Norton were ever released and stating that Norton blames her for his imprisonment and had lied under oath regarding the events.

¶82 Further, it is clear from the court's statements during sentencing that it considered the information the parties provided that had some bearing on Norton's rehabilitative potential. The court expressly acknowledged that Norton had a "good past," that he was well-liked by some people, that it would be "a long time in prison for someone [Norton's] age," and that Norton's crimes all occurred in one "concrete discrete event." *See LeBeau v. State*, 2014 UT 39, ¶ 54, 337 P.3d 254 (noting that a sentencing court should "consider all relevant factors when evaluating the defendant's rehabilitative potential," including a defendant's age and criminal history). But the court also expressed concern over Norton's failure to take responsibility for his actions. The court explained that "one of

the real difficulties here . . . is [Norton's] inability and unwillingness to follow the truth" related to the events. The court stated that it accepted the jury's verdict, and that in its opinion, the events did not happen "at all the way [Norton said] they happened." Likewise, the court expressed concern over the extreme nature of Norton's crimes.

¶83   To the extent that Norton argues that the court did not consider other relevant factors, such as the Board's role in our indeterminate sentencing scheme, Norton did not specifically raise the factors cited by *LeBeau* as relevant to rehabilitative potential, request the court to conduct a rehabilitative potential analysis, or raise the Board's role as a pertinent consideration. Indeed, the only mention of the Board throughout the sentencing hearing was made by the court, when it informed Norton that the Board would give him credit for the time he had already served and that it would handle collecting any restitution. As we explained above, we will not require a court to sua sponte consider factors on which Norton provided no information or did not raise for consideration. *See Martin*, 2017 UT 63, ¶¶ 64–66; *State v. Alvarez*, 2017 UT App 145, ¶¶ 4–5 & n.4, 402 P.3d 191.

¶84   Norton's other contentions on this point amount to disagreement with how the court weighed certain factors. Norton contends that the court failed to consider the mitigating evidence he offered and that the court ought to have weighed more heavily his age, his lack of criminal history, his employment skills, his desire to move forward with his life, the emotional devastation his divorce caused him, his acceptance of the divorce, and the fact that this amounted to one criminal episode with one victim.

¶85   But merely re-arguing certain factors on appeal and contending the court failed to appropriately weigh them is insufficient to demonstrate an abuse of discretion. *Alvarez*, 2017 UT App 145, ¶ 6. Moreover, the sentencing court is entitled to weigh some factors more heavily than others. *State v. Cline*, 2017

UT App 50, ¶ 7, 397 P.3d 652 (explaining that "not all aggravating and mitigating factors are equally important" because "one factor in mitigation or aggravation may weigh more than several factors on the opposite scale" (quotation simplified)). Here, the court was entitled to weigh the extreme and violent nature of the sexual assaults as well as Norton's failure to take responsibility for them more heavily than other factors offered in mitigation. *See State v. Martin*, 2017 UT 63, ¶¶ 70–71 (concluding that it was not an abuse of discretion for the sentencing court to impose a sentence reflective of the fact that the defendant failed "to take responsibility and express remorse" post-conviction for the crimes of which he was convicted, because this failure "cast serious doubt on [the defendant's] rehabilitative potential"); *LeBeau*, 2014 UT 39, ¶¶ 49–50 (suggesting that sexual crimes "intrude on the fundamental bodily integrity of the victim like no others short of murder" and that sexual crimes "represent an especially heinous form of bodily insult").

¶86   In sum, we conclude that the sentencing court did not exceed its discretion by not reducing Norton's sentence as requested in the interests of justice.

## IV. Cumulative Error

¶87   Norton finally contends that we should reverse under the cumulative error doctrine. *See State v. White*, 2016 UT App 241, ¶ 14, 391 P.3d 311 (explaining that we will reverse under the cumulative error doctrine "only if the cumulative effect of multiple errors undermines our confidence that a fair trial was had" (quotation simplified)). But we have concluded that any potential error in the instructions related to the aggravated sexual assault counts was not harmful, that the court did not err in declining to give the requested lesser included offense instructions, and that the sentencing court did not err or abuse its discretion in imposing the presumptive fifteen-years-to-life sentence for both counts of aggravated sexual assault.

Accordingly, we decline to reverse on the basis of cumulative error.

CONCLUSION

¶88    For the foregoing reasons, we affirm Norton's convictions and the sentence imposed on him.

———————